UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| H&C ANIMAL HEALTH, LLC, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :   Case No. _____ |
| | : |
| CEVA ANIMAL HEALTH, LLC, | : |
| | : |
| Defendant. | : |
| | : |

## **COMPLAINT AND JURY DEMAND**

00868568

## TABLE OF CONTENTS

NATURE OF THE CASE ................................................................................1

PARTIES, JURISDICTION, AND VENUE .....................................................4

GENERAL ALLEGATIONS ..........................................................................5

    A.    Ceva Manufactures Pheromone-Based Pet-Behavior Products....................5

    B.    Ceva Distributes the Products in Three Channels ......................................7

    C.    Under the Agreement, Ceva Must Supply Products to Support H&C's
        Distribution and Sale of Products in the Pet Store Channel and Ecommerce
        Channel ...................................................................................................9

    D.    The Parties Initially Performed the Distribution Agreement Without Incident .........10

    E.    Ceva Acquired ThunderWorks and Determined to Raise Product Prices .................11

    F.    Ceva Breached Its Obligations and Violated H&C's Rights Under the
        Agreement...............................................................................................12

        1)    Ceva Rejected Binding Forecasts and Failed to Deliver Confirmed
                Orders with the Objective of Restricting H&C's Access to Products ............ 13

        2)    For the Dwindling Number of Products It Still Supplied to H&C, Ceva
                Implemented Discriminatory Price Increases .................................. 16

        3)    Ceva Seized Market Share After It Restrained Competition from H&C
                Through Supply Reduction and Price Discrimination ...................................... 18

ANTITRUST ALLEGATIONS........................................................................20

    G.    Market Definition and Monopoly Power: Ceva Has Monopoly Power in the
        U.S. Market for Pheromone-Based Pet-Behavior Products and in the
        Ecommerce Channel Submarket...............................................................20

    H.    Monopolization: Ceva Obtained, Maintained, and Exercised Monopoly Power
        Through Anticompetitive Refusals to Deal and Price Discrimination ......................24

        1)    Ceva Engaged in Anticompetitive Refusals to Deal ....................................... 25

              a.    Ceva Suddenly Stopped Longstanding Profitable Partnerships
                    with Competitors .................................................................. 25

        b.     Ceva Sacrificed Short-Term Profits ...................................................... 27

        c.     Ceva Acted with—and Expressly Stated—the Specific Intent to Obtain Monopoly Power ...................................................................... 28

    2)    Ceva Imposed a Discriminatory Pricing Scheme............................................. 29

        a.     Ceva Sold Products to H&C at a Higher Price for Ecommerce Channel Customers than for Pet Store Channel Customers ................. 29

        b.     Ceva Has Charged H&C Higher Prices for Products H&C Sells to Ecommerce Channel Customers Than Ceva Has Charged for Its Own Sales to Other Ecommerce Channel Customers .......................... 31

I.     Injury and Antitrust Injury: Ceva's Conduct Harms H&C, Competition, and Consumers ................................................................................................32

FIRST CLAIM FOR RELIEF Sherman Antitrust Act, 15 U.S.C. § 2, Monopolization ..............33

SECOND CLAIM FOR RELIEF Sherman Antitrust Act, 15 U.S.C. § 2, in the Alternative, Attempted Monopolization ...............................................................................................36

THIRD CLAIM FOR RELIEF Robinson-Patman Act, 15 U.S.C. § 13(a) and (c), Price Discrimination.................................................................................................................38

FOURTH CLAIM FOR RELIEF Kansas Restraint of Trade Act, Kan. Stat. Ann. § 50-149, Price Discrimination ........................................................................................................40

FIFTH CLAIM FOR RELIEF Kansas U.C.C. 2-716, Specific Performance..............................41

SIXTH CLAIM FOR RELIEF Kansas Common Law, Breach of Contract.................................43

SEVENTH CLAIM FOR RELIEF Kansas Common Law, Breach of the Implied Covenant of Good Faith and Fair Dealing .......................................................................................45

JURY DEMAND ...............................................................................................................47

PRAYER FOR RELIEF ......................................................................................................47

Plaintiff H&C Animal Health, LLC ("H&C") brings this action against Defendant Ceva Animal Health, LLC ("Ceva") for violation of state and federal antitrust laws and breach of contract.   For its Complaint against Ceva, H&C alleges the following:

## NATURE OF THE CASE

1.     Pheromone-based pet-behavior products are used to calm and otherwise modify anxious behavior in pets. In the United States, these products generate tens of millions of dollars in consumer sales every year.

2.     This action is about Ceva, which, on information and belief, manufactures between 75% and 90% of the domestic supply of such products, and how it successfully monopolized the online market for the distribution and sale of such products and, at the same time, breached its distribution agreement with H&C (the "Agreement" or "Agmt.," attached hereto as **Exhibit 1**).

3.     Under the Agreement, through the end of 2020, H&C alone is authorized to distribute and sell Ceva's proprietary line of pheromone-based pet-behavior products (the "Products") to pet stores, and H&C is authorized to compete with other distributors, sub-distributors, resellers and Ceva itself for the distribution and sale of the Products to purely online retailers like Amazon.com and Chewy.com. H&C has spent millions of dollars developing these markets for Ceva's Products.

4.     For several years, H&C's efforts were responsible for bringing the vast majority of Ceva's Products to market, and H&C helped Ceva obtain dominant market share for pheromone-based pet-behavior products. The parties' collaborative relationship changed,

00868568

1

however, when Ceva fortified its market position through the acquisition of another leading supplier, ThunderShirt, LLC, d/b/a ThunderWorks ("ThunderWorks") in 2019.

5.      Thereafter, Ceva breached the Agreement by restricting H&C's access to Ceva Products, by imposing discriminatory price increases on H&C, and by seizing distribution and sales that H&C was entitled to make under the Agreement. Ceva's misconduct has caused H&C to lose sales, lose margin, lose profits, and breach its existing Product-supply contracts with its downstream customers, resulting in severe financial, reputational, and operational harm to H&C.

6.      In addition to breaching the Agreement, Ceva's exclusion of rightful competition from the online marketplace for the distribution and sale of pheromone-based pet-behavior products violates state and federal antitrust laws that prohibit price discrimination and forbid companies from seizing, enhancing, sustaining, or exercising monopoly power in a relevant market through anticompetitive and exclusionary conduct.

7.      Specifically, as of early 2019, Ceva had contractually delegated all but a small share of its control over the distribution and sale of its Products.   But Ceva became dissatisfied with Product pricing under this arrangement—particularly in the competitive online marketplace—and it said so.   In summer 2019, Ceva's representative Phil Blizzard told H&C that Ceva wanted "to avoid a race to the bottom" on Product price and warned that H&C "can't win a price war with us."   Mr. Blizzard then proceeded to explain that Ceva would take control of online sales in order to drive up prices.

8.      Thus, this is the rare case where the would-be monopolist previewed for its leading competitor a plan to restrict access to products, seize control of the market, impose discriminatory pricing, acquire monopoly power, and raise prices for consumers.

00868568

2

9.      And, in fact, that is what Ceva did.   Since late 2019, by virtue of its anticompetitive conduct, Ceva has excluded H&C and other distribution and sales competitors, like Lambert Vet Supply, from selling its Products online and, thus, from competing in the online market for pheromone-based pet-behavior products.   In doing so, on information and belief, Ceva has obtained control over more than 75% of the online market for pheromone-based pet-behavior products.

10.      Ceva's monopoly power is demonstrated by its imposition of discriminatory **price increases to H&C of up to 95%** for Products that H&C sells in the online market and corresponding **minimum-price increases from 30% to well over 100% for consumers** buying Products online, and by **consumer complaints about price increases and a lack of alternatives** in that market to avoid Ceva's sudden price increases.

11.      Based on Ceva's misconduct, H&C asserts claims for monopolization and attempted monopolization under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2; price discrimination under the Robinson-Patman Act, 15 U.S.C. § 13; price discrimination under Kan. Stat. Ann. § 50-149; specific performance; breach of contract; and breach of the implied covenant of good faith and fair dealing.

12.      In addition to its damages arising from these claims, pursuant to Section 4 of the Clayton Act, 5 U.S.C. § 15, and the Kansas Restraint of Trade Act, Kans. Stat. Ann. § 50-161(b), H&C is entitled to three times the amount of its actual damages based on Ceva's violation of antitrust laws.

13.      Pursuant to the Agreement and statute, H&C also seeks an award of its reasonable attorneys' fees and costs in prosecuting this action.

00868568

## PARTIES, JURISDICTION, AND VENUE

14.     Plaintiff H&C Animal Health, LLC was founded in 2013 and operates from

Parker, Colorado.   Each of the limited liability company members resides in Colorado or

Arizona.   H&C offers over-the-counter pet products that traditionally were available only

through veterinarians, so H&C's entry into the market improved pet-product pricing and

availability for consumers.

15.     The company is named after its founder's grandparents, Henry and Clemmie.

16.     Defendant Ceva Animal Health, LLC, is a Delaware limited liability company

and is the North American subsidiary of Ceva Santé Animale, one of the largest and fastest-

growing animal health care companies in the world.

17.     Ceva develops and produces animal pharmaceuticals and provides related services

and equipment.

18.     Ceva is headquartered in Lenexa, Kansas.

19.     On information and belief, Ceva is owned by Ceva Santé Animale, which is the

sole member of the Ceva limited liability company.

20.     Ceva Santé Animale is a French société anonyme (i.e., a corporation) with its

principal place of business in Libourne, France.

21.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331 and 1337 because this action arises under the federal antitrust statutes.

22.     The Court's jurisdiction over H&C's supplemental state law claims is authorized

by 28 U.S.C. § 1367.

23.     On information and belief, the Court also has subject matter jurisdiction over all claims pursuant to 28 U.S.C. § 1332 because complete diversity exists between H&C and its members, on the one hand, and Ceva and its member, on the other, and because the amount in controversy exceeds $75,000.00.

24.     The Court has personal jurisdiction over Ceva because its headquarters and principal operations are in Kansas and because, under Section 11.1 of the Agreement, both parties submitted to exclusive jurisdiction in Kansas for any controversy related to the Agreement.

25.     Venue is proper in the District of Kansas in light of Section 11.1 of the Agreement and pursuant to 28 U.S.C. § 1391(c)(2).

**<u>GENERAL ALLEGATIONS</u>**

**A.      Ceva Manufactures Pheromone-Based Pet-Behavior Products**

26.     Roughly 200 million dogs and cats live in American households, and, just like humans, pets display symptoms of anxiety.   Pet pharmaceutical manufacturers therefore attempt to address pet anxiety with various medications and other treatments.   Among its animal-health offerings, Ceva has developed and manufactures a set of Products that mimic animal pheromones to calm or otherwise modify anxious behavior in pets.

27.     Ceva's first Product, Feliway, is still its best seller, and Ceva now offers Feliway in a variety of delivery mechanisms, from sprays to diffusers to wipes.   Feliway's active ingredient is a synthetic version of the feline-facial-marking pheromone—known as "F3"—that has been shown to reduce symptoms of anxiety in cats that are exposed to it and can be used to prevent scratching or urination in undesirable locations.

00868568

5

28.     Ceva also offers Urine-Away, which uses a proprietary formula to capture, absorb, and counteract molecules that create urine odor, and, when used in conjunction with a Feliway spray, this Product can reduce recurrence of stress-induced urination in a given location.

29.     For households with more than one cat, Ceva offers a line of Feliway Multicat Products, which use a synthetic form of the cat-appeasing pheromone—known as "C.A.P."—that mother cats produce to ease tension among their kittens and that has been shown to reduce conflict among cats in multi-cat homes.

30.     Most recently in the cat-behavior category, Ceva introduced the Feliscratch Product line, which mimics the feline interdigital semiochemical, or "F.I.S.," a pheromone that induces cats to scratch.   When applied to a surface, Feliscratch promotes scratching on that surface rather than another location and, when used in conjunction with Feliway or Feliway Multicat, directs scratching only to selected locations.

31.     For dogs, Ceva developed the Adaptil line of Products, which synthesize the dog appeasing pheromone, or "D.A.P."—a pheromone that, similar to the C.A.P., female dogs produce to calm their puppies.

32.     Ceva's F3-, C.A.P.-, F.I.S.-, and D.A.P.-mimicking Products have been acclaimed by veterinarians and pet owners alike and are viewed as a useful alternative to declawing and other behavior-modification techniques.   According to Ceva, Feliway is the best-selling product for cat-behavior in the world, and Feliway Multicat and Feliscratch are unique products for multi-cat and cat-scratching issues.   Ceva touts Adaptil as the "#1 Brand" for dog-behavior issues and reports that millions of households use it.

33.     Many, if not all, of Ceva's Products are protected by U.S. patents.   On information and belief, those patented Products account for 75-90% of pheromone-based pet-behavior products sold in the United States and a corresponding share of pheromone-based pet-behavior products sold online.

34.     The Products are so prevalent in the marketplace that many consumers are not aware that other pheromone-based pet-behavior products are available.

**B.     Ceva Distributes the Products in Three Channels**

35.     Although Ceva succeeded in developing market-dominating Products, it lacked the skillset, experience, and resources necessary to develop that market and put its Products into the hands of consumers.

36.     Accordingly, Ceva opted to delegate its power over the distribution and sale of its Products to distributors and retailers that could more readily develop the Feliway and Adaptil brands and more effectively store, transport, price, finance, and sell the Products.

37.     Ceva chose to segregate distribution and sale into three channels.

38.     First, Ceva directs Products to consumers through brick-and-mortar pet stores—from small independent pet stores to big-box chains like PetSmart—and the online sales platforms associated with those stores (the "Pet Store Channel," *see* Agmt. §§ 1.20, 1.29, 2.1).

39.     Second, Ceva directs Products to consumers through purely online platforms like Amazon.com and Chewy.com (the "Ecommerce Channel," *see* Agmt. § 2.2).

40.     Third, Ceva directs Products to consumers through veterinary-service providers (the "Veterinary Channel," *see* Agmt. § 1.38).

00868568

7

41.    Under the Agreement, Ceva agreed that H&C alone would market and sell the Products in the Pet Store Channel (Agmt. § 2.1.), and, on information and belief, Ceva likewise restricted Product sales in the Veterinary Channel to certain veterinary distributors (Agmt. § 1.38.).

42.    For the Ecommerce Channel, though, Ceva took a different approach.   In order to entice H&C to invest more resources in market-development efforts for the Products, Ceva authorized H&C to promote and sell Products in the Ecommerce Channel.   But Ceva also wished to entice other distributors, sub-distributors, and resellers to commercialize that channel. Likewise, given its dominant position in the manufacturing market for pheromone-based pet-behavior products, Ceva chose to signal to consumers that they still benefit from price competition in the online market for sales and distribution of such products.   So Ceva created a competitive, rather than exclusive, distribution and sale arrangement for the Ecommerce Channel.   Under the Agreement, H&C, Ceva, and others may compete for sales to and through that channel, at least through the end of 2020.

43.    In short, Ceva chose to relinquish its monopoly power over the distribution and sale of Products in the Ecommerce Channel and to invite pro-consumer competition.

44.    In 2019, though, after H&C had invested millions of dollars to successfully develop the market for Ceva's Products, Ceva determined that consumers benefitted *too* much from competition in the Ecommerce Channel.   Ceva openly regretted its decision to relinquish its monopoly power over the distribution and sale of its Products in that channel.

**C.     Under the Agreement, Ceva Must Supply Products to Support H&C's Distribution and Sale of Products in the Pet Store Channel and Ecommerce Channel**

45.     As noted above, under the Agreement, H&C has the exclusive right to "commercialize"—i.e., to market, promote, sell, have sold, or offer—the Products and a handful of other pet-behavior products for the Pet Store Channel.   (Agmt. §§ 1.8, 2.1 & App'x A.)   In the Ecommerce Channel, H&C enjoys non-exclusive commercialization rights.   (Agmt. §§ 1.8, 2.2 & App'x A.)

46.     Accordingly, by contract, H&C alone may market and sell Products in the Pet Store Channel, while it competes with other distributors, sub-distributors, resellers, and Ceva in the Ecommerce Channel.

47.     H&C does not market or sell Products within the Veterinary Channel.   (Agmt. § 1.38.)

48.     Under the Agreement, H&C has been responsible for the vast majority of Ceva's Product sales in the United States.   To support this arrangement, Ceva must supply H&C with Products to meet H&C's Product-sale forecasts.   Specifically, H&C provides Ceva with twelve-month forecasts for Product sales, of which the first four-month period is a "binding order and [can]not be subsequently revised" by either party.   (Agmt. § 3.1.)   These "Binding Forecasts" specify only Product SKUs, and the Agreement does not differentiate between Products intended for H&C's exclusive Pet Store Channel or the non-exclusive Ecommerce Channel.   (Agmt. § 3.1.)

49.     Furthermore, the Agreement requires H&C to keep a three-month supply of Products in inventory for the two channels it serves based on its actual sales by Product SKU over the preceding 90 days, regardless of the distribution channel.   (Agmt. § 7.4.)

00868568

9

50.     Even if prior sales and forecasts would not support substantial Product orders and sales, at the very least, Ceva must supply and H&C must pay for a minimum annual quantity of Products—worth roughly $5 million.   (Agmt. § 3.4 & App'x A.)

51.     Finally, Ceva promised that it would not "assume or undertake any obligation or commitment that is inconsistent with its obligations" to supply H&C with Products under the Agreement.   (Agmt. § 12.2.6.)

52.     This warranty was critical to H&C's willingness to enter the Agreement and to undertake cost-intensive market-development efforts necessary to the Agreement's success.

53.     The Agreement terminates on December 31, 2020, but H&C has the right to continue distributing the Products and a handful of Ceva's other pet-behavior products until June 2021.   (Agmt. §§ 9.1, 9.5.2.)

**D.     The Parties Initially Performed the Distribution Agreement Without Incident**

54.     Under the Agreement, H&C leveraged its distribution network to bolster Product sales in the Pet Store and Ecommerce Channels.

55.     Consistent with its obligations (Agmt. §§ 6.2, 6.4), H&C invested heavily in promoting and selling the Products and developed new relationships with Product sub-distributors and retailers, entering into separate contracts to supply those downstream entities with Products.

56.     Between the Pet Store and Ecommerce Channels, H&C invested more than $7 million dollars for marketing and relationship-building before 2020, spending millions of dollars in each channel.

00868568

57.     As its distribution and sales volume rapidly increased, H&C repeatedly emailed Binding Forecasts and purchase orders to Ceva that, at least until spring 2019, Ceva consistently confirmed via email without delay.

58.     H&C's Binding Forecasts and orders covered its full needs for its Pet Store and Ecommerce Channel customers.   Consistent with H&C's obligations under the Agreement, H&C's Binding Forecasts and purchase orders did not identify in which channel Products would be distributed and sold.

59.     Ceva never rejected H&C's orders before spring 2019, and it never reduced H&C's Binding Forecasts.

60.     Indeed, during that time, Ceva consistently pressured H&C to order, distribute, and sell more Products, stating that H&C should plan to sell upwards of $30 million of Products each year, by 2020—a plan Ceva continued to press until early 2019.

61.     Ceva consistently supplied Products to meet H&C's Binding Forecasts and purchase orders, and H&C had sufficient Product supply to meet its contractual obligations to retailer customers.   H&C and Ceva consistently performed the Agreement in this manner for several years.

E.     **Ceva Acquired ThunderWorks and Determined to Raise Product Prices**

62.     The parties' steady performance under the Agreement continued until mid-2019 when, through its corporate parent, Ceva announced it would acquire ThunderWorks, a leading manufacturing competitor in the market for pet-calming products.   Among other things, ThunderWorks sold its own line of pheromone-based pet-behavior products, branded as ThunderEase, which it marketed in different formulations for single cats, multiple cats, and

00868568

dogs—akin to Feliway, Feliway Multicat, and Adaptil.   ThunderWorks' principal product is a non-pharmaceutical pet-behavior product called the ThunderShirt, which is a garment worn by pets to increase their sense of security and calm.

63.    After the acquisition of ThunderWorks, Ceva's cooperative relationship with H&C turned acrimonious.   To address this change in behavior, H&C scheduled a call with Ceva in July 2019.

64.    At the start of that call between Ceva's representative Phil Blizzard and representatives of H&C, Mr. Blizzard told H&C: "This call will not go well for you."

65.    In particular, he told H&C directly that Ceva was no longer satisfied with the pricing of Products, especially for Products sold in the Ecommerce Channel where various distributors and resellers competed with Ceva for sales.

66.    Mr. Blizzard stated that Ceva wanted to "avoid a race to the bottom" on price for Products and warned H&C that it could not "win a price war" with Ceva, so he explained Ceva would take measures to control sales and raise prices for Products sold in the Ecommerce Channel.

67.    Ceva also notified H&C that it intended to exclude H&C from the Ecommerce Channel under any future distribution arrangements.   Eventually, though, Ceva notified H&C that it simply would not renew the Agreement at all.

**F.    Ceva Breached Its Obligations and Violated H&C's Rights Under the Agreement**

68.    Beginning in mid-2019, Ceva proceeded to breach the Agreement in three distinct ways.

00868568

12

69.     First, Ceva restricted H&C's access to Products for the Pet Store and Ecommerce Channels by disregarding Binding Forecasts, reducing purchase orders, and shorting purchase orders even after Ceva accepted and approved them.

70.     Second, Ceva began requiring H&C to report whether Products it acquired would be sold in the Pet Store or Ecommerce Channel and imposed discriminatory price increases of up to 95% for Products H&C sold to Ecommerce Channel customers.

71.     Third, Ceva used its acquisition of ThunderWorks to market and sell Products in the Pet Store Channel, in violation of the Agreement, all in an effort to expand its power over distribution and sale of Products.

     1)     **Ceva Rejected Binding Forecasts and Failed to Deliver Confirmed Orders with the Objective of Restricting H&C's Access to Products**

72.     H&C's Binding Forecasts and orders set forth Product amounts that H&C needs to support the demand of its customers.   Ceva knows this, yet in mid-2019 it started ignoring H&C's Binding Forecasts and withholding Products H&C had ordered—even after Ceva had accepted those orders.

73.     Between January 2018 and March 2019, Ceva had filled more than 90% of all H&C Product orders.

74.     But after March 2019, when Ceva announced its acquisition of ThunderWorks, that rate fell precipitously.

75.     From April through August that year, the fulfillment rate fell to 77.7%, then to 44.6% between September 2019 and March 2020.

76.     In the first three-and-a-half weeks of March 2020, **Ceva reduced H&C's orders to barely 20% of what H&C needed and ordered**.



*Figure 1 – Percentage of H&C Product Orders Filled by Ceva over Time*

77.     Ceva's conduct dramatically affected H&C's Product inventory levels.   As noted, the Agreement requires H&C to maintain in inventory—and thus Ceva must supply—sufficient Products to satisfy three months' worth of H&C's Product sales, based on sales in the preceding three-month period.

78.     From January 2018 through February 2019—i.e., before the ThunderWorks acquisition began—Ceva ensured that H&C maintained, on average, 3.1 months' worth of inventory.

79.     In March 2019, however, Ceva's supply of Products to H&C began to fall, and H&C's inventory levels from that point through February 2020 averaged only 1.2 months' worth.

80.     Ceva's reduction of Product supply over the last year has therefore caused H&C's Product inventory to fall far below the level necessary for H&C to serve its Pet Store and

Ecommerce Channel customers and far below the three-month minimum required by the

Agreement:



*Figure 2 – H&C Product Inventory Levels over Time*

81.     H&C has large, fixed contracts to distribute Products to Pet Store Channel

customers and has been forced to direct all available inventory to satisfy those contracts.   Thus,

Ceva's throttling of Product supply has had the effect of reducing supply even more sharply in

the Ecommerce Channel and substantially hindering H&C's ability to compete in that channel.

82.     H&C also has been forced to reduce its customer base in the Pet Store Channel as

a direct result of Ceva delaying, under-delivering, and refusing H&C's Product orders.   Even so,

H&C's inability to obtain Products from Ceva has forced H&C to breach its obligations to

downstream customers in the Pet Store Channel and to incur penalties, fines, and other costs of

more than a million dollars to date.

83.     Moreover, all of this has caused substantial financial and reputational harm to

H&C and disrupts its operations in ways that cannot be quantified.   For example, H&C

developed a strong partnership in the Pet Store Channel with PetSmart and, in 2019, won an award for being a top distributor to the nationwide chain, yet in 2020, H&C will have to pay PetSmart hundreds of thousands of dollars in penalties for failing to supply an adequate volume of Products.   Even worse, those penalties represent only a small portion of the harm H&C suffers, after substantial investment on its part, as a result of falling from the status of a top distributor to the ranks of a delinquent partner.

84.     Ceva is fully aware of the harm its conduct has caused and continues to cause to H&C's business, not least because H&C still is required to report Product-inventory and -sales data under the Agreement.

85.     Ceva has justified its restraint of Product supply by citing a lack of Products to sell to H&C, but this is a specious justification.   In fact, there is no evidence of a Product shortage.   To the contrary, over the last year, Ceva has started to market and sell Products in the Pet Store Channel, contrary to the exclusivity granted to H&C under the Agreement.   Ceva has even offered special Product-sale promotions.   And Ceva continues to execute Product sales in the Ecommerce Channel.

86.     Ceva does all of this despite its express contractual duty to avoid any other obligations that would interfere with its obligations to H&C.   (Agmt. § 12.2.6.)

**2)     For the Dwindling Number of Products It Still Supplied to H&C, Ceva Implemented Discriminatory Price Increases**

87.     Even as it restricted Ceva's access to Products, Ceva instituted two major changes for the dwindling supply of Products that H&C still could sell.

88.     First, although the Agreement did not differentiate between Products intended for the Pet Store Channel and the Ecommerce Channel, and despite no requirement that H&C report

00868568

16

channel-specific data, Ceva demanded that H&C start specifying whether Products it acquires are for distribution to Pet Store or Ecommerce Channel customers.   This upended the parties' course of performance.   Prior to 2019, H&C had acquired ever-increasing volumes of Products for customers in both channels, and Ceva had gladly filled those orders and enjoyed the expanding revenue stream without any regard to whether H&C sold into one channel or the other.

89.     Second, Ceva imposed **price increases between 28% and 95% for all Products** H&C ordered.   (*See* August 9, 2019 Notice of Price List Amendment, attached hereto as **Exhibit 2**.)   And because Ceva now tracks the channel into which Products are sold, it enforces that price increase in a discriminatory manner.   For Products H&C sells to Ecommerce Channel customers, H&C either must absorb or pass on to its customers the 28-95% price increases.   But for Products sold to Pet Store Channel customers, if H&C can satisfy certain onerous sales and reporting requirements, Ceva provides and has provided a rebate covering nearly the entire price increase.

90.     While Ceva purports to offer this rebate to cover H&C's marketing costs, H&C did not request the rebate, which is in no way tied to any actual costs incurred or services provided by H&C for sales to the Pet Store Channel as opposed to the Ecommerce Channel. The rebate is pretextual—a fig leaf to cover naked price discrimination that Ceva imposes to make it uneconomic for H&C to compete effectively against Ceva's own rising prices in the Ecommerce Channel.

91.     That is, even as Ceva charges H&C drastically increased prices for Products H&C distributes and sells in the Ecommerce Channel, Ceva has increased the prices for the same

Products that it sells in the Ecommerce Channel, directly or through third parties, but still at a price lower than what Ceva charges to H&C in order to edge out competition from H&C and obtain monopoly power in that channel.

92.     Ceva's discriminatory pricing has deprived H&C of sales it otherwise would have made at non-discriminatory prices, and, in the rare instances when H&C has made sales, Ceva's pricing eliminated the margin that H&C had previously earned on sales in the Ecommerce Channel during the course of the Agreement's performance.

**3)     Ceva Seized Market Share After It Restrained Competition from H&C Through Supply Reduction and Price Discrimination**

93.     The Agreement confers on H&C the "exclusive right to Commercialize the Product" in the Pet Store Channel as well as the right to compete for distribution and sales in the Ecommerce Channel, and these rights have been central to H&C's business model throughout the term of the Agreement.

94.     Nevertheless, around the time that Ceva started disregarding Binding Forecasts and discriminating on price, it also began to take for itself the sales that H&C had been making in the Pet Store and Ecommerce Channels.

95.     Ceva held marketing meetings and promoted direct sales of Products with Pet Store Channel customers, without involving H&C, and it used its acquisition of ThunderWorks to sidestep H&C's rights.   Specifically, Ceva began to market and sell Products in the Pet Store

00868568

18

*and* Ecommerce Channels under branding such as ThunderEase, "Powered by Feliway" and "Powered by Adaptil":



*Figure 3 – Ceva Products Branded as "ThunderEase" for Sale in Pet Store and Ecommerce Channels*

96.     Moreover, because the Agreement requires H&C to provide detailed Product inventory and sales data to Ceva (Agmt. §7.5), Ceva had unusual visibility into the Pet Store and Ecommerce Channels that enabled it to undercut H&C.   Thus, Ceva not only violated H&C's rights under the Agreement—Ceva also used proprietary H&C information obtained under the Agreement to harm H&C even more.

97.     Attempts like this to co-brand Products covered by the Agreement and to invade H&C's commercialization rights strike at the heart of H&C's business.

98.     But Ceva's conduct does not harm only H&C.   By clearing H&C (and other distributors, sub-distributors, and re-sellers) from the market—particularly the erstwhile competitive submarket in the Ecommerce Channel—Ceva restrained price competition for the

distribution and sale of Products, which, in turn, deprived consumers of choice and cleared the way for higher Product prices.

## ANTITRUST ALLEGATIONS

99.    Ceva has engaged in anticompetitive conduct in order to obtain, enhance, maintain, and exercise monopoly power in the Ecommerce Channel for pheromone-based pet-behavior products.

100.    Ceva also has engaged in price discrimination by charging a substantially higher price to H&C for Products it sells to Ecommerce Channel customers than Ceva charges (i) to H&C for Products it sells to Pet Store Channel customers or (ii) to other customers in the Ecommerce Channel that H&C supplies directly and indirectly.

101.    Ceva has harmed H&C by restraining its access to Products that the Agreement requires Ceva to furnish to H&C and by raising prices in a manner that prevents H&C from effectively competing for sales in the Ecommerce Channel, even though H&C has the contractual right to compete for Product distribution and sales in the channel.

102.    Ceva has harmed competition and consumers by restraining price competition from H&C and other large distributors that provide a competitive check on prices.

**G.    Market Definition and Monopoly Power: Ceva Has Monopoly Power in the U.S. Market for Pheromone-Based Pet-Behavior Products and in the Ecommerce Channel Submarket**

103.    A relevant market is pheromone-based pet-behavior products sold in the United States because there is no reasonably interchangeable substitute for such products.   On information and belief, Ceva's Products account for approximately $50 million out of a total U.S. market of between $55 and $65 million—or a market share roughly between 75% and 90%.

104.     The Ecommerce Channel for distribution and sale of pheromone-based pet-behavior products is a relevant submarket in which Ceva excluded rightful competition, acquired monopoly power, and imposed monopoly prices.   Ceva has demonstrated that the Ecommerce Channel is a discrete market for antitrust purposes by separating it from other channels in the Agreement, charging different prices for Products in that channel than in other channels, and, tellingly, by successfully raising the price for sales of Products in that channel—including direct increases of up to 95% for its distributor H&C and corresponding minimum-price increases for consumers—without suffering a concomitant loss of demand.   Indeed, even after Ceva imposed higher prices in fall 2019, H&C's customers continued to seek Products from H&C that it cannot supply at any price due to restricted supply.

105.     At all relevant times, the Ceva Products have represented the vast majority of pheromone-based pet-behavior products sold in the United States and the vast majority of such sales in the Ecommerce Channel.   Before it had acquired ThunderWorks, however, and in an effort to build its brand, Ceva had willingly relinquished control over the distribution and sale of those Products in the Ecommerce Channel, where distributors, sub-distributors, and resellers competed with Ceva to sell Products to customers.

106.     Starting in mid-2019, Ceva implemented a systematic strategy to restrain competition and seize market share and, on information and belief, Ceva has taken control of nearly all Product sales and pricing in the Ecommerce Channel so that it controls more than 75% of sales in that submarket for pheromone-based pet-behavior products.

107.    Ceva now possesses monopoly power in the Ecommerce Channel submarket and has used it to raise prices—up to a 95% price increase to H&C and minimum-price increases from 30% to well over 100% for consumers.

108.    Consumer Product reviews in early 2020 include complaints about higher prices in the Ecommerce Channel expressly attributed to Ceva, not to distributors or retailers.

109.    One consumer reviewing a Feliway diffuser on February 28, 2020 stated that he "had it for about 7 months now.   (6 refills.)   I continue to purchase it from Amazon.   I will say the price has gone up quite a bit since I started using it."   But, he concluded, "[m]y cat appears to be calm and has not had any other issues.   I'll continue using this."

110.    Pet-health products enjoy unusually strong brand loyalty because, once a product works for a pet, the consumer is disinclined to try out competing products that may not work as well or may cause harm.   This dynamic serves the monopoly interests of first-to-market products like the Products and creates substantial barriers to entry for manufacturers of other pheromone-based pet-behavior products.

111.    The time- and cost-intensive development process for pheromone-based pet-behavior products, along with Ceva's patent portfolio for its Products, create additional barriers to entry for would-be market participants.

112.    Consumers in the Ecommerce Channel are also disinclined to seek alternative purchasing options in other channels in light of the convenience and incentives—e.g., "Amazon Prime"—associated with purchases in the Ecommerce Channel.

113.     Because of these dynamics, there is little cross-elasticity of demand, and there are few reasonably interchangeable substitutes, for the Products generally and for Products sold in the Ecommerce Channel in particular.

114.     Ceva had the ability to directly confirm these market dynamics and to chart a strategy to obtain monopoly power in the Ecommerce Channel submarket when it acquired ThunderWorks.   Indeed, only days after that acquisition closed in July 2019, Ceva imposed price increases up to 95% on H&C for Products sold in the Ecommerce Channel, and it aggressively reduced H&C's Product supply.

115.     On information and belief, Ceva had obtained cost, pricing, and consumer-demand data from ThunderWorks showing that Ceva's price increases for Products sold in the Ecommerce Channel would not result in a shift of demand from Products to other pheromone-based product and non-pheromone based pet-behavior products like the ThunderShirt, or a shift from the Ecommerce Channel to other channels where prices did not rise as precipitously.   In other words, Ceva had obtained market data showing that pheromone-based pet-behavior products are a distinct market and that, if Ceva seized power over distribution and sales in the Ecommerce Channel submarket, it could raise prices for its Products in that submarket without losing market share.

116.     Ceva then acted on that information.

117.     In sum, the Ecommerce Channel submarket for pheromone-based pet-behavior products and Ceva's monopoly power therein are demonstrated directly by Ceva's successful Product-price increases without a concomitant loss of demand, and circumstantial market data shows Ceva's dominant market share and that there are few, if any, reasonably interchangeable

00868568

23

products for the Products, or at least none sufficient to prevent Ceva from imposing supracompetitive pricing now that distribution competitors are restrained.

**H.      Monopolization: Ceva Obtained, Maintained, and Exercised Monopoly Power Through Anticompetitive Refusals to Deal and Price Discrimination**

118.    Unlike most manufacturers, Ceva presently does *not* have a natural monopoly over the distribution and sale of its Products.   Through the Agreement and agreements with other companies like Lambert, Ceva relinquished monopoly power over the distribution and sale of the Products in exchange for those partners' market development efforts and the benefit of presenting consumers with competitive options rather than a Hobson's Choice.

119.    Thus, until at least the end of 2020, Ceva does not have rightful monopoly power over the distribution and sale of the Products, let alone over pheromone-based pet-behavior products generally.

120.    But, as it told H&C in mid-2019, contracts notwithstanding, Ceva intended to seize monopoly power in the Ecommerce Channel in order to increase prices.

121.    Ceva achieved monopoly power and has maintained it through two interrelated courses of conduct.

122.    First, Ceva engaged in an anticompetitive refusal to deal with longstanding partners in its distribution network—often in violation of contractual obligations to cooperate—and sacrificed short-term profits in order to drive those partners from the Ecommerce Channel.

123.    Second, Ceva implemented a discriminatory pricing scheme for its Products that had the effect of putting disfavored purchasers at a competitive disadvantage relative to favored purchasers, and of reducing supply and raising prices for Products in the Ecommerce Channel,

00868568

24

which had already been deprived of meaningful competition by virtue of Ceva throttling Product supply.

124.     As a result of these acts to exclude and discriminate against competitors, Ceva has obtained—or come dangerously close to obtaining—monopoly power that has enabled it to impose supracompetitive pricing for Products in the Ecommerce Channel.

       **1)**        **Ceva Engaged in Anticompetitive Refusals to Deal**

125.     In *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), the Supreme Court held Section 2 of the Sherman Act prohibits a monopolist or would-be monopolist from suddenly ending a longstanding profitable venture with a competitor when, in doing so, the monopolist sacrifices short-term profits solely in order to achieve an anticompetitive end.

       **a.**        **Ceva Suddenly Stopped Longstanding Profitable Partnerships with Competitors**

126.     For years, Ceva and H&C engaged in a profitable contractual collaboration whereby H&C helped build a market for Ceva Products in the Pet Store and Ecommerce Channels, even as H&C competed with other distributors and Ceva for sales in the Ecommerce Channel.

127.     But suddenly, despite its contractual obligation to continue supplying its largest distributor with Products, Ceva restricted H&C's access to Products with the express intent to reduce competition so that it could raise prices.

128.     As noted above, Ceva has refused to fill 80% of the Product orders H&C placed in March 2020, despite having filled nearly all H&C orders at the same time in 2019.

129.    This drastic reduction in Product supply has had the practical effect of freezing H&C out of the Ecommerce Channel, because H&C must allocate most of its dwindling Product supply to its Pet Store Channel customers with whom it has binding supply agreements.

130.    Ceva knows this based on its experience with H&C, complaints from H&C, and contractually required sales and inventory reporting from H&C.

131.    Moreover, for the few Products H&C can still allocate to Ecommerce Channel customers, Ceva has imposed price increases between 28% and 95% that prevent H&C from competing economically for even a small share of sales in that channel.

132.    Ceva imposes these price increases on H&C's Ecommerce Channel sales even while it sells at lower prices (i) to H&C for Pet Store Channel sales and (ii) to its own Ecommerce Channel customers, directly and indirectly.

133.    In short, Ceva has deliberately and successfully taken steps to restrain H&C as a meaningful price competitor in the Ecommerce Channel.

134.    But Ceva has gone even further.

135.    On information and belief, Ceva also has reduced or cut off entirely the supply of Products for another major distributor, Lambert, which had distribution and sales contracts with Ceva through the end of 2019 and also competed with Ceva on Product price in the Ecommerce Channel.

136.    Lambert lists 18 Products from Ceva's Feliway line on its direct-sale website, but as of early May 2020, 15 of those Products were listed as "out of stock."

00868568

### b.      Ceva Sacrificed Short-Term Profits

137.    To achieve monopoly power in the Ecommerce Channel, Ceva breached its Agreement with H&C, upended its longstanding relationship with Lambert, and, in doing so, sacrificed profits that it would have otherwise earned in the short term.

138.    As noted, Ceva has drastically reduced H&C's Product supply in order to reduce H&C's ability to compete in the Ecommerce Channel.   Ceva's Product-supply restrictions have had the collateral effect of reducing H&C's ability to make sales and earn Ceva profits from Pet Store Channel sales by well over 50%.   Although (in breach of the Agreement) Ceva has begun to market and sell Products in the Pet Store Channel, it cannot rightfully recoup the profits it has given up as a result of reducing H&C's sales in the Pet Store Channel, nor could it recoup those losses in any event because it lacks the distribution network that H&C brings to bear.

139.    Additionally, Ceva has lost sales through H&C and Lambert to the Ecommerce Channel, and, although Ceva is authorized to sell in the channel, there is no evidence that it has recouped the resulting lost profits through its own direct sales or by sales through other distributors in the Ecommerce Channel.

140.    Indeed, on information and belief, Ceva has taken steps to remove other distributors from the Ecommerce Channel, just as it has restrained competition from H&C and Lambert.

141.    Overall, in just the first three months of 2020, Ceva sacrificed nearly $4 million in Product sales through H&C in order to reduce H&C's ability to compete in the Ecommerce Channel, and Ceva also has given up revenue and profits from Product sales through Lambert.

00868568

142.     Ceva did not achieve efficiencies through these losses or promote other procompetitive ends; rather, Ceva sacrificed short-term profits only in order to acquire and use monopoly power, and its sacrifice would have been irrational but for that purpose.

### c.     Ceva Acted with—and Expressly Stated—the Specific Intent to Obtain Monopoly Power

143.     Ceva rebuked long-term profitable partnerships and sacrificed short-term profits with the sole aim, expressly stated to H&C, of acquiring monopoly power in the Ecommerce Channel so that it could raise prices.

144.     Ceva told H&C it would not tolerate a "race to the bottom" on price and that H&C would lose any "price war" with Ceva.   One way or another, Ceva stated, it would take control of and raise prices in the Ecommerce Channel.

145.     Ceva has succeeded in that aim and now wields the power to raise consumer prices for Products in the Ecommerce Channel, and consumers have had to accept these price increases because Ceva successfully stifled price competition from reasonable alternatives to Ceva's offerings.

146.     The circumstances here mirror the refusal-to-deal monopolization claim from *Aspen Skiing*:

| **ASPEN SKIING v. ASPEN HIGHLANDS** | **H&C v. CEVA** |
|---|---|
| Long-term business relationship that provided cooperative product offering to consumers | Same |
| Relationship existed absent any statutory obligation or duty | Same |
| Can presume prior relationship was thus mutually advantageous | Same |
| Sudden course reversal by defendant | Same |
| Course reversal caused losses for defendant | Same |

00868568

28

| Defendant refused to sell product at same price available to others in the market | Same |
|---|---|
| Unhappy customers | Same |
| Defendant took steps to discourage consumer business with plaintiff | Same |
| Defendant continued to deal with other competitors in other competitive markets | Same |
| Exclusionary conduct aimed at chief competitor | Same |

147.    Ceva did not refuse to deal with H&C, Lambert, or others for procompetitive reasons.   It has not leveraged efficiencies to provide more Product offerings at better prices for consumers.   Rather, Ceva refused to deal with its longtime contractual counterparty H&C and other distribution partners, even while sustaining short-term lost profits, because this course of conduct consolidated Ceva's market power and its ability, in the long-term, to charge monopoly prices for Products in the Ecommerce Channel.

148.    Ceva now controls more than 75% of sales for pheromone-based pet-behavior products in the relevant market and submarket, and it is successfully exercising monopoly pricing power.

**2)    Ceva Imposed a Discriminatory Pricing Scheme**

149.    The Robinson-Patman Act prohibits "price discrimination"—i.e., price differentiation or the charging of different prices to different customers for goods of like grade and quality.

150.    Ceva has engaged in two separate sets of price discrimination.

**a.    Ceva Sold Products to H&C at a Higher Price for Ecommerce Channel Customers than for Pet Store Channel Customers**

151.    First, Ceva has charged different prices to H&C for two discrete sets of customers—(1) Ecommerce Channel customers like Amazon.com, for which Ceva has charged

00868568

29

H&C across-the board price increases of 28-95% for Products, and (2) Pet Store Channel customers like PetSmart, for which Ceva has provided a rebate covering nearly all of the price increase.

152.    At approximately the same time, H&C has acquired Products pursuant to this disparate pricing and resold them to Pet Store Channel and Ecommerce Channel customers.

153.    Although Ceva has used different packaging to make the Products appear different, the Products sold in the Pet Store and Ecommerce Channels do not differ—both have been the same pheromone-based pet-behavior Products with the same characteristics.

154.    Ceva has not discriminated on price in an effort to match the competitive prices of other manufacturers—it does so only in order to restrain competitive pricing in the Ecommerce Channel.

155.    Although Ceva claims that the price differential is intended to compensate distributors and retailers for their marketing costs in the Pet Store Channel, that justification is pretextual because any marketing or other costs associated with sales in the Pet Store Channel were not requested and do not nearly account for the so-called "rebate" for such sales.

156.    By charging a discriminatorily high price to H&C for Products sold in the Ecommerce Channel, Ceva has restrained H&C's ability to compete for sales in the Ecommerce Channel, reduced H&C's revenues and profits, and bolstered its own market power in a successful effort to impose monopoly prices in the Ecommerce Channel.

      **b.**    **Ceva Has Charged H&C Higher Prices for Products H&C Sells to Ecommerce Channel Customers Than Ceva Has Charged for Its Own Sales to Other Ecommerce Channel Customers**

157.    Separately, Ceva has charged H&C a higher price for Products H&C has distributed and sold to Ecommerce Channel customers than Ceva has charged for the same Products it sells to and through other Ecommerce Channel customers.

158.    Starting in Fall 2019, Ceva has charged and H&C has paid price increases of 28-95% for Products that H&C has distributed and sold to and through, e.g., Chewy.com, while, on information and belief, Ceva has sold the same Products at lower prices directly to and through, e.g., Amazon.com.

159.    The relevant Products share the same characteristics and have been sold by Ceva in comparable and contemporaneous transactions, and Ceva's differential pricing is not justified by a need to match the competitive prices of manufacturers, nor is the price differential justified by actual cost differences.

160.    Ceva's price discrimination has resulted in less favorable Product pricing for H&C's customers in the Ecommerce Channel compared to similarly situated customers that Ceva serves directly and indirectly and, therefore, violates Congress's objective to assure that all sellers—here, Amazon.com, Chewy.com, and other Ecommerce Channel sellers—receive evenhanded treatment from their suppliers.

161.    Further, by charging H&C a markedly higher price for the Products H&C sells to Ecommerce Channel customers, Ceva has created for itself the opportunity to raise its own prices for Products it sells to Ecommerce Channel customers, although only to a price point with which

H&C cannot meaningfully compete in light of the even higher price Ceva has forced H&C to pay.

162.    By charging H&C a markedly higher price for Products than it charges to Ecommerce Channel customers, Ceva has crippled H&C's ability to compete on price in the Ecommerce Channel, reduced H&C's revenues and profits, and bolstered Ceva's own market power in a successful effort to impose monopoly prices in the Ecommerce Channel.

163.    Consumer prices for Products in the Ecommerce Channel have risen as a result of Ceva's price discrimination.

**I.    Injury and Antitrust Injury: Ceva's Conduct Harms H&C, Competition, and Consumers**

164.    H&C is a victim of Ceva's strategic, anticompetitive conduct, which has cost H&C millions of dollars in lost sales, margins, and profits.   Furthermore, Ceva's conduct has caused H&C to forfeit millions of dollars in marketing and market-development investments required by the Agreement.

165.    But H&C is not Ceva's ultimate target.   In the Ecommerce Channel, Ceva intended to achieve—and has achieved—monopoly power, i.e., the power to control sales volume and prices.   Indeed, by its own account, Ceva undertook its anticompetitive scheme to exclude H&C and other competitors from the Ecommerce Channel and to impose discriminatory pricing in the Ecommerce Channel with the sole objective to raise consumer prices in that submarket.

166.    Ceva's ultimate target, therefore, is competition and consumers of the Products.

167.    By all metrics, Ceva hit its target.   Since its anticompetitive conduct began in earnest in August 2019, Ceva has excluded all but a small share of competitors from distribution

00868568

32

and sale of pheromone-based pet-behavior products and imposed up to 95% price increases on H&C for Products sold to Ecommerce Channel customers.   Additionally, Ceva has successfully imposed substantial minimum-price increases—increases from 30% to well over 100%—for Feliway and Feliway Multicat Products sold in the Ecommerce Channel:



*Figure 4 – Feliway Minimum-Price Comparisons Between August 2019 and May 2020*

168.    Consumers testify to Ceva's anticompetitive achievement, stating that they pay more for Products by virtue of Ceva's near-elimination of competing Product distributors.

169.    Ceva's anticompetitive scheme has imposed and will impose tens of millions of dollars of additional costs for consumers as a result of restrained Ecommerce Channel competition and at least $14 million to $20 million in lost sales, lost margin, lost profits, and lost investments for H&C, in addition to reputational and operational harm.

### FIRST CLAIM FOR RELIEF
### Sherman Antitrust Act, 15 U.S.C. § 2
### Monopolization

170.    H&C realleges the preceding allegations as though fully set forth here in its First Claim for Relief.

171.    The Sherman Act prohibits monopolization, which is the possession of monopoly power in a relevant market that was acquired, enhanced, maintained, or exercised by the use of

exclusionary or anticompetitive conduct that, in turn, caused harm to competition and consumers.

172.    Before mid-2019, Ceva controlled sales and pricing for only a small share of pheromone-based pet-behavior product distribution and sales in the Ecommerce Channel.   Ceva had chosen to relinquish any natural monopoly over the distribution and sale of its Products in favor of competition among distributors, sub-distributors, resellers, and Ceva itself.   Over the course of 2019 and early 2020, however, Ceva has acquired, enhanced, maintained, and exercised monopoly power in that submarket.   Now, Ceva controls sales for nearly all its Products online, and more than 75% of all pheromone-based pet-behavior product sales overall.

173.    Demonstrating its monopoly power, Ceva swiftly and successfully has raised prices for Products in the Ecommerce Channel, generating complaints from consumers, who will pay millions of dollars more for Products absent competitive alternatives.   As other distribution competitors, such as Lambert, exhaust inventory or are cut off from selling Products in the Ecommerce Channel, Ceva will be able to increase consumer prices even more without a competitive check.

174.    Ceva obtained its monopoly power and the corresponding ability to impose supracompetitive pricing through anticompetitive and exclusionary conduct.   Through a course of Product restrictions and discriminatory price increases, Ceva refused to deal with its largest distributor, H&C, for Product sales, even though H&C is contractually entitled to acquire and distribute Ceva's Products.   Specifically, in order to restrain H&C as a competitor in the distribution and sale of Products in the Ecommerce Channel, Ceva cut H&C's Product supply to 20% or less of what H&C ordered to fill its own customers' demand, and for the few Products

00868568

34

Ceva supplied to H&C for sales in the Ecommerce Channel, it raised prices by as much as 95% (far more than the effective price increases for Product sales in other channels).   Ceva took similar steps to exclude competition from other distributors.

175.     In doing so, Ceva has sacrificed short-term profits that it would have obtained if it had filled H&C's and other distributors' Product orders, and Ceva is unable to recoup those lost profits through its own independent sales.   Ceva accepted these short-term losses in order to exclude competition in the Ecommerce Channel, and its sacrifice of profits would have been irrational but for that anticompetitive end.

176.     Ceva's anticompetitive conduct has restrained competition and harmed consumers by reducing consumer access to pheromone-based pet-behavior products and increasing the price consumers must pay for those products.

177.     Furthermore, as a direct result of Ceva's anticompetitive conduct, H&C has suffered injury in fact.   Ceva's anticompetitive conduct has harmed H&C by depriving it of sales revenue, margins, and profits.   Ceva dramatically has limited the volume of Products sold to H&C for the express purpose of reducing the ability of H&C to compete in the Ecommerce Channel submarket, and also has used discriminatory price increases to eliminate H&C's ability to earn a margin on those dwindling sales it still is able to make in that submarket.   As alleged above, H&C has suffered millions of dollars of damages as a result of Ceva's anticompetitive conduct, including damages from lost sales, lost margins, lost profits, lost investments, and reputational and operational harm.

178.     The injuries and losses suffered by H&C constitute antitrust injury because they represent an injury of the type the antitrust laws were intended to prevent and flow directly from

00868568

35

Ceva's anticompetitive conduct described above, including Ceva's refusal to deal with H&C and its anticompetitive price increases and discriminatory pricing.

### SECOND CLAIM FOR RELIEF
**Sherman Antitrust Act, 15 U.S.C. § 2**
**in the Alternative, Attempted Monopolization**

179.    H&C realleges the preceding allegations as though fully set forth here in its Second Claim for Relief.

180.    Even if Ceva had not successfully monopolized the Ecommerce Channel for Products, it engaged in an attempt to monopolize, which the Sherman Act also prohibits.

181.    A defendant attempts to monopolize in violation of the Sherman Act by engaging in anticompetitive or exclusionary conduct with the specific intent to monopolize and by achieving a dangerous likelihood of obtaining monopoly power, resulting in antitrust injury.

182.    Here, Ceva has acted with the specific intent to monopolize the market as demonstrated when Phil Blizzard told H&C that Ceva intended to monopolize the Ecommerce Channel market for pheromone-based pet-behavior products so that it could charge supracompetitive prices.

183.    Before mid-2019, Ceva controlled sales and pricing for only a small share of pheromone-based pet-behavior product distribution and sales in the Ecommerce Channel.   Ceva had chosen to relinquish any natural monopoly over the distribution and sale of its Products in favor of competition among distributors, sub-distributors, resellers, and Ceva itself.   Over the course of 2019 and early 2020, however, Ceva has acquired, enhanced, maintained, and exercised monopoly power in that submarket.   Now, Ceva controls sales for nearly all its Products online, and more than 75% of all pheromone-based pet-behavior product sales overall.

184.    Through anticompetitive, exclusionary conduct set forth above, there is a dangerous probability that Ceva will obtain monopoly power, if it has not done so already.

185.    Demonstrating its near-monopoly (if not full-monopoly) power, Ceva swiftly and successfully has raised prices for Products in the Ecommerce Channel, generating complaints from consumers, who will pay millions of dollars more for Products absent competitive alternatives.   As other distribution competitors, such as Lambert, exhaust inventory or are cut off from selling Products in the Ecommerce Channel, Ceva will be able to increase consumer prices even further without a competitive check.

186.    Ceva's anticompetitive conduct has restrained competition and harmed consumers by reducing consumer access to pheromone-based pet-behavior products and by increasing the price consumers must pay for those products.

187.    Further, as a direct result of Ceva's anticompetitive conduct, H&C has suffered injury in fact.   Ceva's anticompetitive conduct has harmed H&C by depriving it of sales revenue and expected margins and profits.   Ceva dramatically has limited the volume of Products sold to H&C for the express purpose of reducing the ability of H&C to compete in the Ecommerce Channel submarket, and also has used discriminatory price increases to eliminate H&C's ability to earn a margin on those minimal sales it still is able to make in that submarket.   As alleged above, H&C has suffered millions of dollars of damages as a result of Ceva's anticompetitive conduct, including damages from lost sales, lost margins, lost profits, lost investments, and reputational and operational harm.

188.    The injuries and losses suffered by H&C constitute antitrust injury because they represent an injury of the type the antitrust laws were intended to prevent and flow directly from

00868568

37

Ceva's anticompetitive conduct described above, including Ceva's refusal to deal with H&C and its anticompetitive price increases and discriminatory pricing.

**THIRD CLAIM FOR RELIEF**
**Robinson-Patman Act, 15 U.S.C. § 13(a) and (c)**
**Price Discrimination**

189.    H&C realleges the preceding allegations as though fully set forth here in its Third Claim for Relief.

190.    A claim for price discrimination under the Robinson-Patman Act requires a showing of (i) a difference in price (ii) in two reasonably contemporaneous sales, one in interstate commerce, (iii) from a single seller, (iv) involving commodities (v) of like grade and quality, and (vi) that the price differential may substantially lessen competition or tend to create a monopoly in any line of commerce.

191.    Here, Ceva is engaged in two separate sets of discriminatory pricing.

192.    First, Ceva has charged roughly 28-95% more, after rebates, for a set of Products it has sold to H&C for distribution to Ecommerce Channel customers than, at the same times throughout late 2019 and 2020, it has charged for the same set of Products it has sold to H&C for distribution to Pet Store Channel customers.

193.    The sets of Products for both sets of sales have traveled in interstate commerce from Ceva to H&C and then on to H&C's customers around the country, and the Products in both sets of sales have been commodities of the same grade and quality—the only difference between the sets of Products has been, in some cases, packaging but not the Products themselves.

194.    By charging a higher price to H&C for Products distributed and sold in the Ecommerce Channel, Ceva has restrained price competition from H&C and caused H&C's

Ecommerce Channel customers to pay higher prices.   Moreover, because H&C has been Ceva's largest distributor, restraining price competition from H&C has substantially harmed competition in the Ecommerce Channel and has, in fact, empowered Ceva to acquire, maintain, enhance, and exercise monopoly pricing power in that submarket.   This, in turn, has harmed consumers by reducing consumer access to pheromone-based pet-behavior products and increasing the price consumers must pay for those products.

195.   Second, on information and belief, at the same time, Ceva has charged a higher price for a set of Products it has sold to H&C for distribution to Ecommerce Channel customers than, at the same times throughout late 2019 and 2020, Ceva has charged for the same set of Products it has sold directly or indirectly to other Ecommerce Channel customers.

196.   The sets of Products for both sets of sales have traveled in interstate commerce, from Ceva to H&C or to Ecommerce Channel customers all over the country, and the Products in both sets of sales have been commodities of the same grade and quality—the only difference between the sets of Products has been, in some cases, packaging but not the Products themselves.

197.   By charging a higher price to H&C for Products it distributes and sells in the Ecommerce Channel, Ceva has imposed less favorable Product pricing for H&C's customers in the Ecommerce Channel compared to similarly situated customers that Ceva serves directly and indirectly and, therefore, violates Congress's objective to assure that all sellers—here, Amazon.com, Chewy.com, and other Ecommerce Channel sellers—receive evenhanded treatment from their suppliers.

198.   Further, by charging H&C a markedly higher price for the Products H&C sells to Ecommerce Channel customers, Ceva has created for itself the opportunity to raise its own prices

00868568

for Products it sells to Ecommerce Channel customers, although only to a price point with which

H&C cannot meaningfully compete in light of the even higher price Ceva has forced H&C to

pay.

199.    By charging H&C a markedly higher price for Products than it charges to

Ecommerce Channel customers, Ceva has crippled H&C's ability to compete on price in the

Ecommerce Channel, reduced H&C's revenues and profits, and bolstered Ceva's own market

power in a successful effort to impose monopoly prices in the Ecommerce Channel.   This, in

turn, has harmed consumers by reducing consumer access to pheromone-based pet-behavior

products and increasing the price consumers must pay for those products

200.     As a direct result of both sets of price discrimination set forth above, H&C has

suffered injury in fact.   As alleged above, H&C has suffered millions of dollars of damages as a

result of Ceva's discriminatory pricing, including damages from lost sales, lost margins, lost

profits, lost investments, and reputational and operational harm.

201.    The injuries and losses suffered by H&C represent an injury of the type the

antitrust laws were intended to prevent and flow directly from Ceva's price discrimination.

**FOURTH CLAIM FOR RELIEF**
**Kansas Restraint of Trade Act, Kan. Stat. Ann. § 50-149**
**Price Discrimination**

202.    H&C realleges the preceding allegations as though fully set forth here in its

Fourth Claim for Relief.

203.    Ceva charged differing prices for the same Products that, on information and

belief, were sold to Kansans who purchased those Products from different sections of the State—

namely, from Ecommerce Channel sources like Amazon.com, on the one hand, and from Pet
Store Channel sources like PetSmart, on the other hand.

204.    Ceva engaged in this price discrimination between these two sections of the State
in order to destroy competition from H&C for Product sales through the Ecommerce Channel,
and Ceva succeeded.

205.    Through its discriminatory pricing, Ceva has obtained the power to increase
prices for its Product sold via the Ecommerce Channel, without a competitive check, and it has
done so to the detriment of Kansans, who now pay more for Products in the Ecommerce
Channel.   Ceva's discriminatory pricing also has caused H&C millions of dollars in damages,
including from lost sales, lost margin, lost profits, lost investments, and reputational and
operational harm.

**FIFTH CLAIM FOR RELIEF**
**Kansas U.C.C. 2-716**
**Specific Performance**

206.    H&C realleges the preceding allegations as though fully set forth here in its Fifth
Claim for Relief.

207.    H&C and Ceva executed the operative Agreement as of May 1, 2017.   (Agmt.,
Recital.)

208.    Since the inception of the Agreement, H&C has performed its obligations under
the Agreement, at great cost.

209.    In the Agreement, the parties agreed that H&C would issue twelve-month
forecasts, the first four months of which "shall constitute a binding order and may not be
subsequently revised ('***Binding Forecast***')."   (Agmt. § 3.1.)

00868568

210.    Further, the Agreement requires H&C at all times to keep a three-month supply of Products in inventory for the two channels it serves, based on its actual sales by Product SKU over the preceding 90 days.   (Agmt. § 7.4.)

211.    Even if prior sales and Binding Forecasts did not support substantial Product orders and sales, the parties agreed that Ceva would nevertheless supply and H&C would pay for a minimum annual quantity of Products—roughly $5 million of Products.   (Agmt. § 3.4 & App'x A.)

212.    By March 2020, however, Ceva was approving only 20% of the Products H&C ordered and that are required by H&C's Binding Forecasts.   As a result, H&C cannot maintain three months of Product inventory and, at times, has held barely a half-month of inventory on hand.

213.    H&C contracted for, and only Ceva can supply, the Products.

214.    Because Ceva has violated the Binding Forecasts, has refused to sustain H&C's requisite three-month inventory of Products, and has at times delivered less than the *pro rata* portion of the minimum annual quantity of Products required by the Agreement as a baseline, H&C has been unable to satisfy its obligations to downstream customers and therefore has breached agreements with those customers.   In addition to paying penalties and liquidated damages to its customers, H&C has suffered and is suffering irreparable reputational harm that threatens its successful operation as an animal-health-product distributor.

215.    For every Product that Ceva sells or delivers to a different customer, Ceva violates its representation and warranty that it "will not, during the Term, assume or undertake

00868568

42

any obligation or commitment that is inconsistent with its obligations under, or the terms and conditions of, this Agreement."   (Agmt. § 12.2.6.)

216.    If Ceva were forced to perform its obligations under the Agreement, it would not be harmed—it would enjoy more sales and increased revenue.   Ceva would likely lose its unlawfully obtained monopoly power in the Ecommerce Channel, but this would have the salutary effect of furthering the public's interest in a competitive Ecommerce Channel for pheromone-based pet-behavior products.

217.    Because H&C cannot obtain Products from any other source and because it has suffered and continues to suffer irreparable reputational and operational harm as a result of Ceva's violation of its obligations, representations, and warranties, H&C seeks an order of specific performance requiring Ceva, before it supplies any Product for other distributors or for its own direct sales, to supply Products to H&C in a manner that (i) adheres to H&C's Binding Forecasts and (ii) ensures H&C maintains a three-month inventory of Products based on SKU sales from the first quarter of 2019.

### SIXTH CLAIM FOR RELIEF
**Kansas Common Law**
**Breach of Contract**

218.    H&C realleges the preceding allegations as though fully set forth here in its Sixth Claim for Relief.

219.    H&C and Ceva executed the operative Agreement as of May 1, 2017.   (Agmt., Recital.)

220.    Since the inception of the Agreement, H&C has performed its obligations under the Agreement, at great cost.

00868568

221.    There are no grounds for Ceva to terminate the Agreement before December 31, 2020.  (Agmt. §§ 9.2-9.3.)

222.    Under the Agreement, H&C has the exclusive right to market, sell, and otherwise commercialize Products in the Pet Store Channel and the non-exclusive right to market, sell, and otherwise commercialize Products in the Ecommerce Channel.   (Agmt. §§ 1.8, 2.1, 2.2.)

223.    H&C's right to commercialize the Products covers all "activities directly or indirectly related to marketing, promotion, selling, having sold, or offering for sale the Products in the Territory," including the use of all Product trademarks.   (Agmt. §§ 1.8, 2.1-2.3.)

224.    This right extends throughout the United States but does not cover commercialization of the Products in the Veterinary Channel.   (Agmt. § 1.38.)

225.    The Agreement obligates Ceva to sell Products to H&C because H&C has the "right" to commercialize the Products and because both parties are bound by the first four months of each H&C Product forecast and to additional minimum sales volumes.   (Agmt. §§ 2.1-2.2, 3.1, 3.4.)

226.    Furthermore, Ceva is obligated to supply H&C with Products sufficient to maintain three months of Product inventory based on the preceding three months of sales, and Ceva is prohibited from "assum[ing] or undertak[ing] any obligation or commitment that is inconsistent with its obligations" to H&C under the Agreement.   (Agmt. § 12.2.6.)

227.    Ceva has breached the Agreement, including by:

        a.      failing to honor the Binding Forecasts provided by H&C;

        b.      failing to supply H&C with Products sufficient to maintain three months
                of inventory;

c.      failing to fill the Agreement's mandatory minimum sales volumes;

d.      delaying and under-delivering Product orders, even after accepting those orders and committing to fill them;

e.      rejecting and modifying H&C's Product orders when, at the same time, undertaking other obligations to supply Products to third parties, including other customers, distributors, and resellers;

f.      commercializing Products in the Pet Store Channel in violation of H&C's exclusive distribution rights; and

g.      creating new channel-specific reporting requirements that exceeded H&C's reporting requirements in the Agreement.

228.    Ceva's breaches of contract have caused H&C millions of dollars in damages, including from lost sales, lost margin, lost profits, lost investments, and reputational and operational harm.

### SEVENTH CLAIM FOR RELIEF
**Kansas Common Law**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**

229.    H&C realleges the preceding allegations as though fully set forth here in its Seventh Claim for Relief.

230.    In the Agreement, as in all contracts governed by Kansas law, there is an implied covenant of good faith and fair dealing that prohibits Ceva from doing anything that would intentionally and purposely impair H&C's right to receive the bargained-for benefits of the Agreement.

00868568

231.    Under the Agreement, H&C has the right to market and sell Products in the Pet Store and Ecommerce Channels

232.    Since the inception of the Agreement, H&C has performed its obligations under the Agreement, at great cost.

233.    Starting in 2019, however, Ceva has breached its implied covenant of good faith and fair dealing by taking actions with the intent to deprive H&C of its ability to obtain the rights and benefits it bargained for in the Agreement.

234.    Specifically, Ceva has breached the implied covenant, including by:

   a.    modifying and rejecting H&C purchase orders that it had always filled in the past and that it knew were necessary to satisfy H&C's downstream contractual obligations;

   b.    imposing a capricious rebate scheme with onerous requirements;

   c.    imposing discriminatory pricing and withholding Products in a manner that has prevented H&C from selling Products in the Ecommerce Channel and thereby rendering H&C's commercialization rights in that channel valueless or nearly valueless;

   d.    preventing H&C from satisfying its obligation to "maintain at least a three (3) month supply" of Products on a "per SKU" basis, not a per channel basis (Agmt. § 7.4);

   e.    using H&C's highly confidential sales and inventory data, shared pursuant to the Agreement, to target Product restrictions in a manner that prevents

> H&C from competing with Ceva for Product sales in the Ecommerce
> Channel; and
>
> f.  selling Products to other distributors and customers in lieu of and ahead of
>     H&C's orders.

235.  Ceva's breaches of the implied covenant of good faith and fair dealing have caused H&C millions of dollars in damages, including from lost sales, lost margin, lost profits, lost investments, and reputational and operational harm.

## JURY DEMAND

236.  H&C demands a jury trial on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff H&C Animal Health, LLC respectfully requests that the Court enter judgment in its favor and against Defendant Ceva Animal Health, LLC and grant relief as follows:

> a)  On H&C's First, Second, and Third Claims for Relief, awarding H&C damages
>     arising from its lost sales, lost margin, lost profits, lost investments, and other
>     harms caused by Ceva's discriminatory pricing and exclusionary conduct, trebled
>     pursuant to federal antitrust law;
>
> b)  On H&C's Fourth Claim for Relief, awarding H&C damages arising from its lost
>     sales, lost margin, lost profits, lost investments, and other harms caused by Ceva's
>     discriminatory pricing, trebled pursuant to Kansas antitrust law;
>
> c)  On H&C's Third and Fourth Claims for Relief, awarding preliminary and
>     permanent injunctive relief barring Ceva's discriminatory pricing schemes;

00868568

d)      On H&C's Fifth Claim for Relief, ordering preliminary and permanent injunctive relief of specific performance, effective for the term of the Agreement, that requires Ceva, before it supplies any Product for other distributors or for its own direct sales, to supply Products to H&C in a manner that (i) adheres to H&C's Binding Forecasts and (ii) ensures H&C maintains a three-month inventory of Products based on SKU sales from the first quarter of 2019;

e)      On H&C's Sixth and Seventh Claims for Relief, awarding H&C its damages arising from its lost sales, lost margin, lost profits, lost investments, and other harms caused by Ceva's breach of the Agreement and of the covenant of good faith and fair dealing implied in the Agreement;

f)      Additional damages and equitable relief as proven at trial;

g)      Applicable interest;

h)      Attorneys' fees and other costs awardable to the prevailing party under the Agreement and pursuant to statute; and

i)      Such other and further relief as the Court deems just and proper.

00868568

Dated this 28th day of May, 2020.

EVANS & MULLINIX, P.A.

 /s/ *Colin N. Gotham*
David R. Schapker KS # 24596
Colin N. Gotham KS # 19538
7225 Renner Road, Suite 200
Shawnee, Kansas 66217
Telephone:   913.890.7009
Facsimile:   913.962.8701
dschapker@emlawkc.com
cgotham@emlawkc.com

HOLLAND & HART LLP

James E. Hartley (*pro hac vice* pending)
1800 Broadway, Suite 300
Boulder, Colorado 80302
Telephone: 303.245.2075
Facsimile: 303.473.2720
jehartley@hollandhart.com

Paul D. Swanson (*pro hac vice* pending)
555 17th Street, Suite 3200
Denver, Colorado 80202
Telephone:   303.295.8578
Facsimile:   303.416.8814
pdswanson@hollandhart.com

Eric Maxfield CO# (*pro hac vice* pending)
222 South Main Street, Suite 2200
Salt Lake City, Utah 84101
Telephone:   801.799.5882
Facsimile:   801.618.3832
egmaxfield@hollandhart.com

**ATTORNEYS FOR PLAINTIFF**
**H&C ANIMAL HEALTH, LLC**

00868568

49