**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **H&C ANIMAL HEALTH, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION** |
| | ) | **CASE NO.  2:20-cv-02271-JWB-ADM** |
| **v.** | ) | |
| | ) | |
| **CEVA ANIMAL HEALTH, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................2

A.      The Agreement Creates Mutual Obligations for Product Supply and Distribution. ............2

B.      The Parties' Performed the Agreement Until Ceva Began a Campaign to Breach the
        Agreement and Oust H&C As a Competitor in the Ecommerce Channel. ..........................3

C.      Ceva Restrained Competition by Monopolizing the Ecommerce Channel. ......................5

LEGAL STANDARD ..........................................................................................................5

ARGUMENT ....................................................................................................................6

I.      TO OBTAIN A MONOPOLY, CEVA ENDED ITS LUCRATIVE DEALINGS WITH
        COMPETITOR H&C DESPITE THE LOSS OF SHORT-TERM PROFITS. ..................6

        A.      A Monopolist Like Ceva Does Not Have an Unfettered Right to Choose to
                Whom and at What Price It Sells Its Products. ........................................................6

        B.      Ceva Engaged in an Anticompetitive Refusal to Deal Under *Aspen Skiing*. ...........9

                1.      Ceva Willingly Collaborated with H&C for Years and
                        Profited from the Collaboration. .................................................................9

                2.      Ceva Terminated Its Course of Dealing, and Its
                        Corresponding Sacrifice of Short-Term Profits Is Irrational
                        Except to Monopolize. ..............................................................................11

                        a.      Ceva's Actions Froze H&C Out of the Ecommerce Channel........11

                        b.      Ceva Absorbed Steep Short-Term Losses Only to Achieve the
                                Anticompetitive End of Monopoly Power. ....................................13

II.     H&C'S ALLEGATIONS RAISE TWO ACTIONABLE SETS OF PRICE
        DISCRIMINATION BY CEVA. ....................................................................................15

        A.      Ceva Provides Favorable Terms to Direct-Buying Retailers and Must
                Ensure That Comparable Terms Are Available to All Retailers. .........................16

        B.      Ceva Cannot Shield Its Price Discrimination by Directing It Through
                H&C. ....................................................................................................................17

        C.      H&C Is Not Liable for Robinson-Patman Violations. ..........................................18

III.    KANSAS STATUTE ABROGATED CEVA'S LONE AUTHORITY FOR ITS SOLE ARGUMENT TO DISMISS H&C'S STATE ANTITRUST CLAIM. ...........................19

IV.    CEVA BREACHED THE AGREEMENT, AND H&C HAS MULTIPLE REMEDIES AVAILABLE TO IT.................................................................................20

    A.    Ceva Breached Express Contract Terms, Insisting the Agreement Imposes Obligations Only on H&C, Not on Ceva. ............................................21

        1.    Product Supply and Inventory Requirements Bind Both Parties........................................................................................21

        2.    The Pleadings Adequately Allege That Ceva Breached the Agreement by Failing to Honor Purchase Orders It Had Accepted. ..................................................................................23

        3.    Ceva Violated H&C's Exclusive Distribution Rights by Selling Products Directly to Pet Store Channel Customers. .....................23

    B.    Ceva Breached Its Duty to Perform Fairly and in Good Faith Under the Agreement........................................................................................25

    C.    The Contract Does Not Bar the Relief that H&C Seeks. .......................................27

        1.    H&C Seeks Direct Lost Profits Arising Directly from Ceva's Breach. ...............................................................................27

        2.    H&C Also Can Recover Reliance Damages for Investments Required by the Agreement That Ceva's Breaches Rendered Valueless................................................................29

        3.    If Damages Are Inadequate to Make H&C Whole, the Court May Order Ceva to Specifically Perform Its Obligations. ................................................................................29

CONCLUSION...................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Acker Constr. v. Tran*,
    396 S.W.3d 279 (Ark. Ct. App. 2012) ...................................................................28

*Am. News Co. v. Fed. Trade Comm'n*,
    300 F.2d 104 (2d Cir. 1962) ..................................................................................18

*Aspen Skiing Co v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985) ....................................................................................... passim

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...........................................................................................5, 6

*Biotronik A.G. v. Conor Medsys. Ireland, Ltd.*,
    22 N.Y.3d 799 (N.Y. 2014) ...................................................................................28

*Biovail Pharm. v. Eli Lilly & Co.*,
    2003 WL 25901513 (E.D.N.C. Feb. 28, 2003) ......................................................28

*Bonanza Rest. Co. v. Wink*,
    2012 WL 1415512 (Del. Super. Ct. Apr. 17, 2012) ...............................................28

*Cease v. Safelite Glass Corp.*,
    927 F. Supp. 1452 (D. Kan. 1996) .........................................................................20

*Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*,
    555 F.3d 1188 (10th Cir. 2009) .............................................................................14

*CIT Grp./Sales Fin., Inc. v. E-Z Pay Used Cars, Inc.*,
    32 P.3d 1197 (Kan. Ct. App. 2001) ...........................................................22, 23, 27

*Claredi Corp. v. SeeBeyond Tech. Corp.*,
    2010 WL 1257946 (E.D. Mo. Mar. 26, 2010) .......................................................28

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) ...............................................................................................16

*Eastman Kodak Co. v. S. Photo Materials Co.*,
    273 U.S. 359 (1927) ............................................................................................8, 9

*Elwell v. Byers*,
    2009 WL 2106103 (D. Kans. July 16, 2009) ......................................................5, 6

*Fed. Trade Comm'n v. Actavis, Inc.*,
    570 U.S. 136 (2013) ...............................................................................................10

*Fed. Trade Comm'n v. Fred Meyer, Inc.*,
   390 U.S. 341 (1968)..............................................................................16, 17

*Fishman v. Estate of Wirtz*,
   807 F.2d 520 (7th Cir. 1986) ...............................................................12

*Foam Supplies, Inc. v. The Dow Chem. Co.*,
   2006 WL 2225392, (E.D. Mo. Aug. 2, 2006) ..............................7, 9, 12

*Forrest Energy, L.L.C. v. Seib*,
   166 P.3d 449 (Kan. Ct. App. 2007) ......................................................24

*Gen. Indus. Corp. v. Hartz Mountain Corp.*,
   810 F.2d 795 (8th Cir. 1987) .............................................................7, 8

*Great Atl. & Pac. Tea Co., Inc. v. Fed. Trade Comm'n*,
   440 U.S. 78 (1979).................................................................................19

*Ill. Brick Co. v. Illinois*,
   431 U.S. 720 (1977)...............................................................................18

*In re Adderall XR Antirust Litig.*,
   754 F.3d 128 (2d Cir. 2014).................................................................10

*In re Brand Name Prescription Drugs Antitrust Litig.*,
   878 F. Supp. 1078 (N.D. Ill. 1995) ......................................................18

*Indus. Bldg. Materials, Inc. v. Interchem. Corp.*,
   437 F.2d 1336 (9th Cir. 1970) ...............................................................8

*Integon Indem. Corp. v. Thorup Bldg. & Design, Inc.*,
   1989 WL 75630 (D. Kan. June 29, 1989)..............................................26

*JAAAM, Inc. v. Exxon Mobil Corp.*,
   2006 WL 8458011 (W.D. Pa. Sept. 20, 2006) ......................................18

*Julius Nasso Concrete Corp. v. Dic Concrete Corp.*,
   467 F. Supp. 1016 (S.D.N.Y. 1979)......................................................17

*Kan. Baptist Conv'n v. Mesa Op. Ltd. P'ship*,
   253 Kan. 717 (Kan. 1993)...............................................................25, 26

*Law v. Law Co. Bldg. Assocs.*,
   295 Kan. 551 (Kan. 2012).....................................................................25

*Lone Star Indus., v. Horman Family Trust*,
   960 F.2d 917 (10th Cir. 1992) ................................................................6

*Midland Hotel Corp. v. Reuben H. Donnelley Corp.*,
    515 N.E.2d 61 (Ill. 1987) ........................................................................................28

*N.M. Oncology & Hematology Consultants, Ltd. v. Presbyt. Healthcare Servs.*,
    54 F. Supp. 3d 1189 (D.N.M. 2014) ................................................................8, 12

*No Spill, Inc. v. Scepter Canada, Inc.*,
    429 F. Supp. 3d 768 (D. Kan. 2019) .............................................................23, 29

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) ..............................................................7, 9, 14

*O'Brien v. Leegin Creative Leather Prods., Inc.*,
    277 P.3d 1062 (Kan. 2012) .................................................................................20

*Panhandle Agri-Serv. Inc. v. Becker*,
    644 P.2d 413 (Kan. 1982), and *No* .....................................................................29

*Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*,
    499 F.3d 1151 (10th Cir. 2007) ....................................................................27, 28

*Pepsi-Cola Bottling Co. v. Bottling Grp., L.L.C.*,
    2008 WL 234326 (D. Kan. Jan. 28, 2008) ..........................................................29

*Perkins v. Standard Oil Co.*,
    395 U.S. 642 (1969) ............................................................................................18

*Perma Life Mufflers, Inv. v. Int'l Parts Corp.*,
    392 U.S. 134 (1968) ............................................................................................19

*Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*,
    431 F.2d 334 (5th Cir. 1970) ...............................................................................8

*Purolator Prods., Inc. v. Fed. Trade Comm'n*,
    352 F.2d 874 (7th Cir. 1965) .............................................................................18

*Quanta Computer, Inc. v. LG Elecs., Inc.*,
    553 U.S. 617 (2008) ............................................................................................10

*Safeway Inc. v. Abbott Labs.*,
    2010 WL 147988 (N.D. Cal. Jan. 12, 2010) .......................................................12

*Salt Lake Trib. Pub. Co., LLC v. AT&T Corp.*,
    320 F.3d 1081 (10th Cir. 2003) ..........................................................................30

*Schwimmer v. Sony Corp.*,
    637 F.2d 41 (2d Cir. 1980) .................................................................................17

*Source Direct, Inc. v. Mantell*,
    870 P.2d 686 (Kan. Ct. App. 1994) ..................................................27, 29

*Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of R.I.*,
    311 F. Supp. 3d 468 (D.R.I. 2018)..........................................................12

*Tongish v. Thomas*,
    840 P.2d 471 (Kan. 1992)........................................................................29

*Trear v. Chamberlain*,
    425 P.3d 297 (Kan. 2018).........................................................................25

*United States v. Colgate*,
    250 U.S. 300 (1919).............................................................................6, 15

*Valve Corp. v. Sierra Entm't Inc.*,
    431 F. Supp. 2d 1091 (W.D. Wash. 2004).............................................28

*VBR Tours, LLC v. National R.R. Passenger Corp.*,
    2015 WL 5693735 (N.D. Ill. Sept. 28, 2015) ..................................12, 13

*Verizon Commc'ns Inc. v. Law Office of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)..................................................................................10

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020) .................................................................9, 13

*Waste Connections, Inc. v. Ritchie Corp.*,
    296 Kan. 943 (Kan. 2013).................................................................25, 26

*Wayman v. Amoco Oil Co.*,
    923 F. Supp. 1322 (Kan. 1996).........................................................26, 27

*White Indus., Inc. v. Cessna Aircraft Co.*,
    657 F. Supp. 687 (W.D. Mo. 1986) ........................................................17

## STATUTES

15 U.S.C. § 13(a) ...................................................................................17

K.S.A. § 50-149 ................................................................................19, 20

K.S.A. §§ 50-158 .......................................................................................20

K.S.A. §§ 50-161 .......................................................................................20

## OTHER AUTHORITIES

2000 Kan. Laws Ch. 136 (West's 134) (H.B. 2855)....................................20

Plaintiff H&C Animal Health, LLC ("H&C") respectfully submits this brief opposing the motion to dismiss filed by Defendant Ceva Animal Health, LLC ("Ceva") (Dkt. 20, 21).

## INTRODUCTION

Ceva monopolized the market for the online distribution and sale of pheromone-based pet-behavior products by excluding H&C and other distributors from the market. Despite its express obligation to do nothing inconsistent with H&C's right to purchase and distribute Ceva's line of pheromone-based pet-behavior products ("Products"), Ceva choked off H&C's access to Products and imposed discriminatory pricing that ensured H&C could no longer compete. In doing so, Ceva violated antitrust law and breached its obligations to H&C.

Ceva now argues it cannot be liable for monopolization because H&C has not adequately pleaded anticompetitive conduct by Ceva—by Ceva's reckoning, the parties are not even competitors. But Ceva's arguments collide with allegations showing that H&C was Ceva's rightful competitor for the online distribution and sale of Products. Indeed, Ceva created H&C as a competitor in their 2017 Distribution and Supply Agreement ("Agreement" or "Agmt.," Dkt. 1-1). But Ceva then targeted H&C for its nettlesome price competition by cutting off their lengthy and lucrative collaboration and absorbing steep short-term losses in order to block competition, seize market power, and raise prices—a classic anticompetitive refusal-to-deal.

As for its alleged price discrimination, Ceva contends it can escape liability under federal law because it funneled discriminatory prices through intermediaries, but decades of Supreme Court precedent have rejected this formalistic defense and assigned liability for the same sort of disparate pricing Ceva has employed. Ceva's defense against H&C's Kansas price discrimination claim fails for the more mundane reason that Ceva relies on bad law.

1

Finally, as to H&C's contract claims, Ceva contends the Agreement imposed all the burden on H&C but conferred all the benefit on Ceva.  This reading defies the Agreement's plain language and runs contrary to Kansas law that disfavors any reading that would render a contract illusory or permit one party to deprive the other of intended benefits.  H&C is entitled to an award of direct lost profits contemplated in the Agreement, reliance damages for lost investments under the Agreement, and specific performance for any injury that damages cannot remedy.

Ceva's conduct has harmed competition, harmed consumers, and harmed H&C.  H&C's factual allegations fully support its claims, so Ceva's motion to dismiss should be denied.

## **BACKGROUND**

**A.    The Agreement Creates Mutual Obligations for Product Supply and Distribution.**

Ceva engaged H&C as a distributor in 2016, and, in 2017, the parties executed the operative Agreement under which Ceva appointed H&C to distribute Products in the United States.  (Agmt. Recitals & § 1.38.)  Under the Agreement, H&C holds exclusive distribution rights for pet stores and their associated online sales platforms (the "Pet Store Channel"), and H&C is authorized to distribute and sell Products to purely online retailers (the "Ecommerce Channel") in competition with Ceva and other sellers.  (Agmt. §§ 2.1-2.2; Compl. ¶¶ 35-46.)

To support this arrangement, the parties agreed to a detailed supply and inventory arrangement.  H&C must maintain and staff warehouses and "[a]t all times . . . maintain at least a three (3) month supply, per SKU, of Pheromone Products," i.e., "the Ceva branded pheromone products Adaptil and Feliway and any other additional Ceva branded pheromone products on Appendix A" of the Agreement.  (Agmt. §§ 1.30, 7.2-7.4.)  That minimum-inventory level is determined by measuring the preceding 90 days' sales.  (*Id.* § 7.4.)  H&C also must submit a 12-month forecast for Product sales each month, and "[t]he first four (4) months of each forecast shall constitute a binding order and may not be subsequently revised ('***Binding Forecast***')."  (*Id.*

§ 3.1.)  H&C then submits purchase orders to release the Binding Forecast amount in allotments on specific delivery dates.  (*Id.* § 3.2.)  H&C must purchase from Ceva an increasing minimum quantity of Products each year, worth more than $5 million.  (*Id.* § 3.4.1; Compl. ¶ 50.)  To sell these Products, H&C must spend at least 10% of its gross sales on marketing.  (Agmt. § 6.4.)  Ceva is prohibited from "assum[ing] or undertak[ing] any obligation or commitment" that would violate its obligations *or* any other terms and conditions in the Agreement.  (*Id.* § 12.2.6.)

**B.     The Parties' Performed the Agreement Until Ceva Began a Campaign to Breach the Agreement and Oust H&C As a Competitor in the Ecommerce Channel.**

Under the Agreement, H&C invested millions of dollars to market the Products, and it became Ceva's largest distributor.  (Compl. ¶¶ 54-56.)  H&C generated tens of millions of dollars of new revenue for Ceva during the first two years of the Agreement, and in early 2019 Ceva instructed H&C to plan for $30 million of Product sales in 2020.  (*Id.* ¶¶ 57-60.)  As Product sales increased, Ceva supplied Products in the amount set by Binding Forecasts and in the manner agreed in purchase orders.  (*Id.*)  Until mid-2019, Ceva consistently supplied sufficient Product for H&C to meet its minimum annual purchase commitment and the demand of—and contractual obligations to—its rapidly expanding base of retailer customers.  (*Id.* ¶ 61.)

But in 2019, after Ceva announced its acquisition of a rival product manufacturer, ThunderWorks, Ceva began to breach the Agreement.  (*Id.* ¶¶ 62-63.)  At the start of a telephone conference in July 2019, Ceva's representative Phil Blizzard warned H&C: "This call will not go well for you," and proceeded to explain that Ceva was no longer satisfied with Product pricing, especially for Products sold in the Ecommerce Channel where competition kept prices low.  (*Id.* ¶¶ 7, 64-67.)  Ceva wanted to "avoid a race to the bottom" on Product price, Blizzard explained, so it planned to take measures to cripple its acknowledged distribution competitor H&C and, in the aftermath, seize control of sales and raise prices.  (*Id.* ¶¶ 7, 35-36, 42-43, 64-67.)

Ceva made good on its plans.  First, it restricted H&C's access to Products for the Pet Store and Ecommerce Channels by disregarding Binding Forecasts, reducing purchase orders, and shorting purchase orders even after accepting them.  (*Id.* ¶¶ 72-86.)  By early 2020, Ceva cut H&C's Product supply by 80%, delivering far less than the *pro rata* portion of the minimum annual purchases required.  (*Id.* ¶¶ 76, 214.)  As a result, H&C's inventory covered barely one-third of the Agreement's three-month requirement.  (*Id.* ¶¶ 77-80.)  For the fraction of its orders that were filled, H&C had to prioritize Product supply for its binding obligations to Pet Store Channel customers.  (*Id.* ¶ 81.)  Thus, Ceva's drastic reduction in Product supply effectively zeroed out H&C's supply of Products to supply the Ecommerce Channel.  (*Id.* ¶¶ 81, 129.)

If that were not enough to block price competition from H&C in the Ecommerce Channel, Ceva launched new, discriminatory pricing.  (*Id.* ¶¶ 87-92, 131.)  Ceva imposed up to 95% price increases on H&C, but only for Products sold in the Ecommerce Channel.  (*Id.* ¶¶ 88-89, 192.)  This price discrimination pinched H&C in two ways.  Obviously, H&C stood to make far fewer sales to Ecommerce Channel customers when Products suddenly cost twice as much.  (*Id.* ¶¶ 160, 194, 200.)  Worse, Ceva sold direct to Ecommerce Channel retailers below the price it charged H&C for the same Products.  (*Id.* ¶¶ 91-92, 132, 161-162, 195-196.)  So, as one example, Ceva sold Product to H&C for resale to Chewy.com but then sold the same Product direct to Amazon.com at a lower price.  (*Id.* ¶¶ 157-158.)  Given the discriminatorily high prices Ceva imposed for H&C's Product sales in the Ecommerce Channel, even if H&C chose to breach its supply agreements with Pet Store Channel retailers and divert its dwindling Product supply to the Ecommerce Channel, Ceva's discriminatory pricing prevented H&C from competing for sales in that Channel.  (*Id.* ¶¶ 92, 162, 199.)

Finally, Ceva breached H&C's exclusive distribution rights by selling its Products in the Pet Store Channel, including under the branding of its recent acquisition, ThunderWorks, but labeled "Powered by Feliway" and "Powered by Adaptil."  (*Id.* ¶¶ 85, 94-97.)

## C.    Ceva Restrained Competition by Monopolizing the Ecommerce Channel.

By its misconduct, Ceva not only breached the Agreement—it unlawfully monopolized the Ecommerce Channel for Product sales and distribution.  (*Id.* ¶¶ 2, 7-10, 118-148, 172.)  Ceva ended a two-year voluntary collaboration through which H&C generated millions of dollars of profits for Ceva in the Ecommerce Channel, and, to do so, Ceva sacrificed the profits associated with 80% of the Product sales of its largest distributor.  (*Id.* ¶¶ 35-36, 42-43, 125-142, 174-175.)  Ceva has been unable to recoup those lost profits in the short term.  (*Id.* ¶¶ 138-141, 175.)  But, after blocking price competition from H&C and other competitors like Lambert Vet Supply, Ceva now controls more than 75% of the Ecommerce Channel market.  (*Id.* ¶¶ 104-107, 172.)  With that monopoly power, Ceva has begun to impose monopoly prices—sudden price increases of 30% to well over 100%—which, in the long run, will recoup the short-term losses Ceva accepted in order to drive H&C and others from competition.  (*Id.* ¶¶ 107-108, 173.)

## LEGAL STANDARD

"Dismissal is a harsh remedy, and not meant to decide whether the plaintiff will ultimately prevail, but whether the claimant is entitled to support the claims."  *Elwell v. Byers*, No. 08-2227-EFM, 2009 WL 2106103, at *6 (D. Kans. July 16, 2009) (quotations, citations, and alterations omitted).  A plaintiff is entitled to pursue its claim so long as its pleadings contain a "short plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  Even in an antitrust action, the plaintiff's pleadings need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests" and needn't provide "detailed factual allegations."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Thus, no

claim should be dismissed if it is grounded upon allegations of fact that "raise a right to relief above the speculative level." *Id.* Given these standards, a "'motion to dismiss for failure to state a claim is viewed with disfavor, and is rarely granted.'" *Elwell*, 2009 WL 2106103, at *6 n.51 (quoting *Lone Star Indus., v. Horman Family Trust*, 960 F.2d 917, 920 (10th Cir. 1992).

## ARGUMENT

### I.   TO OBTAIN A MONOPOLY, CEVA ENDED ITS LUCRATIVE DEALINGS WITH COMPETITOR H&C DESPITE THE LOSS OF SHORT-TERM PROFITS.

For several years, Ceva competed with H&C in the Ecommerce Channel market for the distribution and sale of Products, but Ceva has cut off that competition and monopolized that market by refusing to deal with H&C. In its motion to dismiss, Ceva contests only the common element of H&C's monopolization and attempted monopolization claims: anticompetitive conduct. (Mot. at 7.) Ceva argues it had no duty to deal with H&C and cannot be liable for refusing to deal, even though Ceva's conduct falls squarely within the parameters of the leading refusal-to-deal case, *Aspen Skiing Co v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).

### A.   A Monopolist Like Ceva Does Not Have an Unfettered Right to Choose to Whom and at What Price It Sells Its Products.

Ceva does not dispute its market power but recites the general rule that a business—even a monopolist—"is free to choose to whom it sells its products." (Mot. at 7-8 (citing *United States v. Colgate*, 250 U.S. 300, 307 (1919)).) The Supreme Court expressly limited that general rule, though, by stating that it applies only "[i]n the absence of any purpose to create or maintain a monopoly." *Colgate*, 250 U.S. at 307.

*Aspen Skiing* illustrates the point. In that case, the Supreme Court limited a monopolist's right to choose its counterparties in certain narrow circumstances. When there is "a preexisting voluntary and presumably profitable course of dealing between the monopolist and [a] rival," the monopolist violates antitrust law by "discontin[uing] the preexisting course of dealing [in a

manner that] suggest[s] a willingness to forsake short-term profits to achieve an anti-competitive end." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074-75 (10th Cir. 2013) (summarizing and applying *Aspen Skiing*).

This rule finds frequent application in supplier-distributor relationships. For example, in *Foam Supplies, Inc. v. The Dow Chemical Co.*, plaintiff FSI purchased chemicals from defendant Dow pursuant to a contractual arrangement, and FSI in turn distributed the chemicals to its customers. No. 05-cv-1772, 2006 WL 2225392, at *1 (E.D. Mo. Aug. 2, 2006). Although Dow supplied FSI, the two also competed for the sales that FSI made. *Id.* Eventually, like Ceva, Dow sought to stifle competition from FSI, so it employed its leverage and imposed a roughly 90% supply restriction and raised prices for the products it did supply. *Id.* Like Ceva, Dow argued that it had "no obligation to supply FSI . . . thus any failure on its part to supply FSI [could not] constitute anticompetitive conduct." *Id.* at *8. The court concluded that Dow's conduct—"discriminatory price and supply manipulations"—fell within the ambit of *Aspen Skiing*:

> Dow's selective application of price hikes and supply shortages to the detriment of a competitor and to the benefit of that competitor's customers [which received better pricing from Dow than FSI] suggests that Dow was willing to sacrifice short-term benefits . . . .

*Id.* at *7, *8. Ceva's alleged misconduct maps neatly onto Dow's.

Similarly, in *General Industries Corp. v. Hartz Mountain Corp.*, a pet-supply distributor won a judgment under Section 2 of the Sherman Act when its manufacturer-supplier opted to withdraw favorable credit terms that it had supplied for years. 810 F.2d 795 (8th Cir. 1987). Even though the manufacturer had the express right to withdraw those credit terms, the Eighth Circuit affirmed judgment in favor of the distributor. *Id.* at 804. It concluded that:

> Although . . . any manufacturer[] has wide latitude to dictate the terms under which it will do business, the jury could reasonably have found that [the manufacturer's] acts toward [its distributor] were not legitimate business practices . . . but were specifically designed to destroy a perceived source of competition.

7

> That the source of this perceived competition was also a distributor of [the manufacturer's] goods does not insulate [it] from the reach of the antitrust laws.

*Id.* at 803; *see also N.M. Oncology & Hematology Consultants, Ltd. v. Presbyt. Healthcare Servs.*, 54 F. Supp. 3d 1189, 1215 (D.N.M. 2014) (monopsony refusal to deal where buyer competed with the supplier and therefore sought to "'financially strangle' and eliminate [the supplier] from the . . . market" to further the buyer's vertical integration in that market).

The refusal-to-deal doctrine long precedes *Aspen Skiing*.  In 1970, the Ninth Circuit revived a Section 2 claim by a distributor that alleged its manufacturer did not "merely refus[e] to deal with" the distributor, but "sought to drive it out of business by unlawful means"—namely, by charging discriminatorily high prices to the distributor and lower prices to other distributors and retailers.  *Indus. Bldg. Materials, Inc. v. Interchem. Corp.*, 437 F.2d 1336, 1341-43 (9th Cir. 1970); *see also id.* at 1344-45 (applying same rationale to Section 2 claim); *accord Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 431 F.2d 334, 339 (5th Cir. 1970) (affirming Section 2 liability for film-product manufacturer that sought to eliminate competing distributor by refusing to deal).  In reaching this conclusion, the Ninth Circuit relied on the 1927 case *Eastman Kodak Co. v. Southern Photo Materials Co.*, where the Supreme Court affirmed judgment against Kodak under the "Anti-Trust Act" for, in relevant part, Kodak's "refusal to sell goods to the plaintiff at dealers' discounts . . . in furtherance of a purpose to monopolize" the plaintiff's distribution market.  273 U.S. 359, 368-69, 375 (1927).

As these case show, Ceva is wrong that a monopolist has the unfettered right to "choose to whom and at what price [it] sells its products."  Under certain circumstances, antitrust law constrains that right.

**B.     Ceva Engaged in an Anticompetitive Refusal to Deal Under *Aspen Skiing*.**

The Complaint plainly alleges that Ceva had "a preexisting voluntary and presumably profitable course of dealing [with its] rival," H&C, and Ceva "discontin[ued] the preexisting course of dealing [in a manner that] suggest[s] a willingness to forsake short-term profits to achieve an anticompetitive end." *Novell*, 731 F.3d at 1074.

**1.     Ceva Willingly Collaborated with H&C for Years and Profited from the Collaboration.**

H&C alleges that the parties executed the operative Agreement in 2017 and performed without incident for two years, during which time H&C developed a national market for Ceva's Products and yielded Ceva millions of dollars in new profits from H&C's distribution.  (Compl. ¶¶ 4, 35-36, 42-43, 54-61, 126, 169.)  These allegations satisfy the first prong of *Aspen Skiing*.

Ceva does not dispute these allegations but attempts to distinguish this case from *Aspen Skiing* on several grounds.  First, Ceva argues that H&C "does not plead that it had a competing product before becoming a distributor of Ceva's product."  (Mot. at 3, 9-10.)  But Ceva does not identify any holding or dicta in *Aspen Skiing* requiring a plaintiff to have possessed a competing product before the voluntary and presumably profitable course of dealing with the defendant, and other refusal-to-deal cases have eschewed such a requirement.  *Southern Photo*, 273 U.S. at 368-69, 375 (competing photo-equipment distributor relied on monopolist manufacturer for means to compete); *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 434, 442-49 (7th Cir. 2020) (competing ad-service provider relied on monopolist ad platform provider for means to compete); *Foam Supplies*, 2006 WL 2225392, at *1, *8-9 (E.D. Mo. Aug. 2, 2006) (competing chemical distributor relied on monopolist manufacturer for means to compete).

Next, Ceva cites a Second Circuit case for the proposition that "[t]he <u>*mere existence*</u> of a contractual duty to supply goods does not by itself give rise to an antitrust 'duty to deal.'"  (Mot.

at 10 (quoting *In re Adderall XR Antirust Litig.*, 754 F.3d 128, 135 (2d Cir. 2014)) (emphasis

added).)  But Ceva's assertion proves too much—nearly all refusal-to-deal claims implicate

preexisting and profitable courses of dealing based on contracts.  Ceva also takes its soundbite

out of context.  In *Adderall*, the plaintiff claimed the defendant had a duty to deal merely by

virtue of a supply obligation in a settlement agreement that forced the defendant to share its

market power.  754 F.3d at 134-35.  The Second Circuit made quick work under these facts,

because the monopolist's settlement concession did not represent a voluntary course of dealing

that "originated in a competitive market and had persisted for several years," as *Aspen Skiing*

requires.  *Id.* at 135; *accord Verizon Commc'ns Inc. v. Law Office of Curtis V. Trinko, LLP*, 540

U.S. 398, 409 (2004) (rejecting refusal-to-deal claim because no preexisting, voluntary, and

presumably profitable course of dealing can be inferred from a compelled course of dealing).

And even if dealings based on a settlement obtained under threat of litigation could be

considered voluntary, they certainly were not profitable, because the monopolist was forced to

relinquish monopoly power and profits.  *Adderall*, 754 F.3d at 135 ("the agreements here were

explicitly *un*profitable").  Here, of course, H&C does not rely on merely the existence of its

contract with Ceva, but on a long, voluntary, and profitable course of dealing under that contract.

H&C has alleged a preexisting, voluntary, profitable relationship with Ceva, so the first

requirement of *Aspen Skiing* is satisfied.[1]

---

[1]      Ceva raises two other arguments that do not bear on the first *Aspen Skiing* requirement.  First, it asserts
immunity from antitrust law for any claim that it "refus[ed] to sell or license" its IP (Mot. at 10), but this outdated
antitrust exception no longer applies, *Fed. Trade Comm'n v. Actavis, Inc.*, 570 U.S. 136, 148 (2013).  In any event,
refusal to grant IP rights is not part of H&C's claim—Ceva expressly conveyed trademark licenses (Agmt. § 2.3)
and relinquished any patent rights with each Product sale, *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617,
625 (2008) ("authorized sale of a patented item terminates all patent rights as to that item" under patent exhaustion
doctrine).  Second, Ceva insists it cannot have acted anticompetitively against H&C because H&C cannot compete
with Ceva *qua* manufacturer and "natural monopolist," but this is beside the point.  (Mot. at 2, 8, 10.)  H&C
competes in the market for the distribution and sale of Products, not in the manufacturing market, and Ceva
relinquished whatever natural monopoly rights a manufacturer may have in the market for distribution and sale
when it opened the market for distribution and sale to competition.  (Agmt § 2.2; Compl. ¶¶ 3, 35-36, 42, 118.)

**2.   Ceva Terminated Its Course of Dealing, and Its Corresponding Sacrifice of Short-Term Profits Is Irrational Except to Monopolize.**

With regard to the second *Aspen Skiing* requirement, H&C pleads detailed facts showing (a) Ceva cut off its longstanding course of dealing with H&C and (b) took short-term losses for the sole anticompetitive purpose of excluding H&C from the Ecommerce Channel in order to obtain monopoly power in that market.  Ceva challenges both facets of this second requirement.

**a.   Ceva's Actions Froze H&C Out of the Ecommerce Channel.**

The pleadings show that Ceva terminated its longstanding arrangement to supply H&C with Products for distribution and sale in the Ecommerce Channel:

- Ceva sharply reduced H&C's Product supply to the point that "Ceva has refused to fill 80% of the Product orders H&C placed in March 2020."  (Compl. ¶ 128; *see also id.* ¶¶ 73-76.)

- "This drastic reduction in Product supply *has had the practical effect of freezing H&C out of the Ecommerce Channel*, because H&C must allocate most of its dwindling Product supply to its Pet Store Channel customers with whom it has binding supply agreements."  (*Id.* ¶ 129 (emphasis added).)

-  "Moreover, for the few Products H&C can still allocate to Ecommerce Channel customers, Ceva has imposed price increases between 28% and 95% that prevent H&C from competing economically for even a small share of sales in that channel."  (*Id.* ¶ 131.)

Even though H&C pleads specific factual allegations showing how Ceva's conduct "has had the practical effect of freezing H&C out of the Ecommerce Channel," Ceva claims that H&C "has not alleged that Ceva has refused, in its entirety, to deal with H&C."  (Mot. at 13.)  Ceva is wrong.  The allegations support an inference of Ceva's total refusal to deal with H&C for Product sales in the Ecommerce Channel, but that is not even required.  *Aspen Skiing* and its progeny acknowledge that a refusal may appear in the guise of a manifestly unreasonable offer rather than an outright termination of dealings.  *Aspen Skiing*, 472 U.S. at 592, 594 (finding defendant refused to deal where plaintiff rejected "an offer that [defendant knew] it could not

accept," and plaintiff continued to deal with defendant through a workaround (citation and modification omitted)); *see also Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of R.I.*, 311 F. Supp. 3d 468, 490-91 (D.R.I. 2018) (declining to dismiss refusal to deal claim where plaintiff "walked away" after defendant offered "unattainable" terms "that it knew could not be accepted"). Put simply: when Ceva agrees only "to deal on unreasonable terms[, that] is merely a type of refusal to deal." *Fishman v. Estate of Wirtz*, 807 F.2d 520, 541 (7th Cir. 1986).

Ceva also argues there can be no refusal-to-deal claim "where the alleged monopolizer continues to sell to the plaintiff, just not at the plaintiff's price." (Mot. at 13.) This is legally incorrect, particularly where the monopolist sells to the plaintiff at a higher price than the monopolist sells elsewhere. *See Safeway Inc. v. Abbott Labs.*, No. 07-cv-5470, 2010 WL 147988, at *7 (N.D. Cal. Jan. 12, 2010) (finding refusal to deal based on price increase that put "competitors in the untenable position of selling . . . at a price that could not compete"); *Foam Supplies*, 2006 WL 2225392, at *8-9 (citing selective price hikes that prevent competition as adequate to support refusal to deal); *see also N.M. Oncology*, 54 F. Supp. 3d at 1215 (concluding that allegations of anticompetitive pricing that "financially strangle[d]" the plaintiff supported refusal to deal). But it's also beside the point. Price is not the primary basis for H&C's contention that Ceva is refusing to deal. H&C alleges that an 80% supply reduction has effectively excluded it from the Ecommerce Channel; as to price, Ceva's discriminatory pricing only adds insult to injury, ensuring that H&C cannot compete in the Ecommerce Channel even if it had the inventory to sell. Ceva intended to exclude H&C from the Ecommerce Channel, and it did so. (Compl. ¶¶ 66-67, 80-81, 129.)

This case is different than *VBR Tours, LLC v. National Railroad Passenger Corp.*, which Ceva cites. (Mot. at 13.) There, the plaintiff claimed refusal-to-deal based on the defendant's

unwillingness to provide a discount.  No. 14-cv-00804, 2015 WL 5693735, at *8 (N.D. Ill. Sept. 28, 2015).  Here, H&C is not complaining merely about a lost discount but a total withholding of Products that Ceva agreed to supply, and did supply for years, for H&C to distribute in the Ecommerce Channel.  Put otherwise, H&C alleges "an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years." *Aspen Skiing*, 472 U.S. at 603.  The circumstances here and in *VBR* are in different categories.[2]

> **b.      Ceva Absorbed Steep Short-Term Losses Only to Achieve the Anticompetitive End of Monopoly Power.**

H&C also has pleaded facts supporting the inference that Ceva sacrificed short-term profits only to achieve the anticompetitive end of driving its main competitor, H&C, and others from the market in order to seize market power.  Ceva cut the supply of Products to its largest distributor by 80% without any near-term prospect for recouping those lost Product sales—only the long-term plan to make back those losses through monopoly pricing.  More specifically:

- "Ceva's Product-supply restrictions have had the collateral effect of reducing H&C's ability to makes sales and earn Ceva profits from Pet Store Channel sales by well over 50%. . . . [Ceva cannot] recoup those losses [through its unauthorized sales in that channel or] in any event because it lacks the distribution network that H&C brings to bear."  (Compl. ¶ 138.)

- "Additionally, Ceva has lost sales through H&C and Lambert to the Ecommerce Channel, and, although Ceva is authorized to sell in the channel, there is no evidence that it has recouped the resulting lost profits through its own direct sales or by sales through other distributors [which it likewise has taken steps to remove from] the Ecommerce Channel." (*Id.* ¶¶ 139-140.)

- "Overall, *in just the first three months of 2020, Ceva sacrificed nearly $4 million in Product sales through H&C in order to reduce H&C's ability to compete in the Ecommerce Channel*, and Ceva also has given up revenue and profits from Product sales through Lambert." (*Id.* ¶ 141 (emphasis added).)

---

[2]       *VBR* also relied on the defendant's procompetitive justifications for its actions, but that is a fact question not amenable to resolution at this stage.  *See Viamedia*, 951, F.3d at 460-61 (collecting cases).  In any event, the pleadings squarely foreclose Ceva's cursory procompetitive justification—i.e., no longer "using a middle-man" (Mot. at 13.)—by alleging that Ceva's conduct gained no efficiencies.  (Compl. ¶¶ 142, 147, 168-169.)

- "Ceva has sacrificed short-term profits that it would have obtained if it had filled H&C's and other distributors' Product orders, and Ceva is unable to recoup those lost profits though its own independent sales." (*Id.* ¶ 175.)

- "Ceva did not refuse to deal with H&C, Lambert, or others for procompetitive reasons.  It has not leveraged efficiencies to provide more Product offerings at better prices for consumers.  Rather, Ceva refused to deal with its longtime contractual counterparty H&C and other distribution partners, even while sustaining short-term lost profits, because this course of conduct consolidated Ceva's market power and its ability, in the long-term, to charge monopoly prices." (*Id.* ¶ 147; *see also id.* ¶ 142 (Ceva's conduct "irrational but for" goal of acquiring monopoly power).)

- In sum, "Ceva rebuked long-term profitable partnerships and sacrificed short-term profits with the sole aim, expressly stated to H&C, of acquiring monopoly power in the Ecommerce Channel so that it could raise prices." (*Id.* ¶ 143.)

Against these allegations, Ceva relies chiefly on *Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188 (10th Cir. 2009) for the proposition that even a monopolist may switch course and pursue new business models without risking antitrust liability.  (Mot. at 12.) But again, Ceva overreads the authority.  In *Christy Sports*, there was no presumably profitable course of dealing terminated by the defendant, which had been providing space to the plaintiff for free.  555 F.3d at 1191, 1197 (noting that plaintiff stopped paying defendant ten years before dispute and was "offering [defendant] nothing" so there was "no indication that [defendant was] terminating a profitable business relationship").  Thus, the defendant there did *not* sacrifice short-term profits—its profits increased immediately.  *Id.* at 1197 (defendant "expect[ed] to increase (not forsake) short-term profits by [ousting plaintiff] and operating its own ski rental facility"); *see also Novell*, 731 F.3d at 1076 (holding that Microsoft did not engage in unlawful refusal to deal when there was "no evidence that Microsoft took any course other than seeking to maximize the company's net profits in the short as well as long-term").  Ultimately, the plaintiff in *Christy Sports* could not satisfy either of *Aspen Skiing*'s requirements.  In contrast, H&C alleges that Ceva ended profitable, preexisting dealings and thereby sacrificed short-term profits, and its conduct would be irrational but for the anticompetitive goal of blocking competition from

14

H&C.  *See supra* n.2 (H&C allegations bar procompetitive justification, which is a fact question anyway).

Ceva also argues that the "facts pled demonstrate, at most, that Ceva was motivated by a desire to make more money selling its own products for itself."  (Mot. at 12.)  Ceva again takes too sweeping a view.  Every capitalist is motivated by a desire to make more money, so if that motive were a defense, no business could ever be held liable for a refusal to deal.  The key question is whether Ceva refused to deal through *anticompetitive means* and for *anticompetitive ends*.  *See Colgate*, 250 U.S. at 307.  Taking all facts and inferences in H&C's favor, the allegations support the inference that Ceva was more than a capitalist.  Rather, Ceva determined that, eventually, it could charge higher prices and obtain larger profit margins from the Ecommerce Channel without competitors, so Ceva ended its longstanding practice of supplying H&C and other competing distributors with Products, thereby losing millions of dollars in near-term sales that these distributors would have made, but obtaining the upside of long-term monopoly power.  By trying to "make more money" through anticompetitive, monopolistic conduct, Ceva violated antitrust law.  Claims 1 and 2 should not be dismissed.

## II.   H&C'S ALLEGATIONS RAISE TWO ACTIONABLE SETS OF PRICE DISCRIMINATION BY CEVA.

H&C alleges that Ceva engaged in unlawful price discrimination under the Robinson-Patman Act through two different sets of transactions.  First, Ceva has charged a higher price for Products sold to H&C for distribution to Ecommerce Channel customers than Ceva has charged for the same Products it sells directly or indirectly to other Ecommerce Channel customers.  (Compl. ¶¶ 157-158, 195.)  Second, Ceva has charged roughly 28-95% more for Products sold to H&C for distribution to Ecommerce Channel customers than it has charged H&C for the same Products for distribution to Pet Store Channel customers.  (Compl. ¶¶ 151, 192.)

Ceva invokes the rule that the Robinson-Patman Act applies to discriminatory pricing only as between two purchasers at the same level of competition, so Ceva disputes comparisons (A) between a sale to H&C and a sale to a retailer and (B) between a sale to H&C for Ecommerce retailers and a sale to H&C for Pet Store retailers.  (Mot. at 14-15.)  Ceva's analysis ignores, however, the indirect competitive harm its discriminatory pricing strategy causes.  "Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law."  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466-67 (1992).  For this reason, Supreme Court precedent and other caselaw hold that a manufacturer violates the Robinson-Patman Act where, as here, the anticompetitive impact of price discrimination is felt by a retailer that does not purchase directly from the manufacturer.

### A.      Ceva Provides Favorable Terms to Direct-Buying Retailers and Must Ensure That Comparable Terms Are Available to All Retailers.

As for H&C's first claim, Ceva objects because it sells to purchasers—Amazon.com and H&C—that operate at different levels of competition.  But this disregards the fact that H&C's Ecommerce Channel retailer customers _do_ compete at the same level as Amazon.com; therefore, Ceva's disparate pricing harms competition between those customers and Amazon.com.

In *Federal Trade Commission v. Fred Meyer, Inc.*, 390 U.S. 341 (1968), the Supreme Court addressed a fact pattern like this one.  There, several grocery suppliers established a direct relationship with a favored retail grocery store, Meyer, and gave Meyer promotional consideration that was not made available to other retailers.  *Id.* at 345.  The suppliers, however, sold to other retailers through wholesalers, which were "not competing customers . . . with Meyer."  *Id.* at 348.  Faced with the argument, like Ceva's, that the Robinson-Patman Act "reaches only discrimination between customers competing for resales at the same functional level and, therefore, does not mandate proportional equality between Meyer and the two

16

wholesalers," the Supreme Court responded that the argument "rests on a narrow definition of 'customer' which becomes wholly untenable when viewed in light of the central purpose of [Section 2(d) of the Robinson-Patman Act] and the economic realities with which its framers were concerned."[3] *Id.* at 349. Thus, "it is clear that the direct impact of Meyer's receiving discriminatory promotional allowances is felt by the disfavored retailers with whom Meyer competes in resales [so the Act] places on the supplier the responsibility for making promotional allowances available to those resellers who compete directly with the favored buyer." *Id.* at 357.

After *Fred Meyer*, a disfavored indirect purchaser has standing to sue. *See Julius Nasso*, 467 F. Supp. at 1019. And if a disfavored indirect purchaser—i.e., H&C's customer—has standing to sue, so does H&C because Ceva's conduct harms H&C directly and "the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly" in the Ecommerce Channel. 15 U.S.C. § 13(a); *see also Schwimmer v. Sony Corp.*, 637 F.2d 41, 46 (2d Cir. 1980) (finding standing under Robinson-Patman Act for any "person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws").[4]

## B.    Ceva Cannot Shield Its Price Discrimination by Directing It Through H&C.

Ceva objects to H&C's other price discrimination allegation because it involves a direct sale from Ceva to only one purchaser, H&C. But Ceva's discriminatory pricing scheme imposes disparate prices on retailers—higher prices for Ecommerce Channel retailers and lower prices for

---

[3]     Section 2(d) of the Robinson-Patman Act prohibits discrimination in promotional considerations, whereas Section 2(a) prohibits discriminatory pricing and Section 2(c) prohibits discrimination through "other compensation." Ceva effectuates its disparate pricing scheme through a "rebate" for marketing costs, but the rebate is pretextual, so it is not properly a promotional consideration. It either is an adjustment to price that results in discriminatory pricing forbidden under Section 2(a), or it is "other compensation" barred by Section 2(c). The rule in *Fred Meyer* applies across all three provisions. *Julius Nasso Concrete Corp. v. Dic Concrete Corp.*, 467 F. Supp. 1016, 1019 (S.D.N.Y. 1979) ("Although [*Meyer*] was rendered only under § 2(d), the rationale applies equally to §§ 2(a) & 2(f)."); *accord White Indus., Inc. v. Cessna Aircraft Co.*, 657 F. Supp. 687, 701-02 (W.D. Mo. 1986).

[4]     In the introduction to its Motion to Dismiss, Ceva argues that "H&C's claim fails because it cannot demonstrate that it was injured by the acts it alleges." (Mot. 4.) This argument is never fully joined, but H&C's harm as a result of Ceva's Robinson-Patman violations is well-pleaded. (Compl. ¶¶ 194, 197-199.)

Pet Store Channel retailers—which harms competition between those retailers.  Thus, Ceva is engaging in price discrimination between Ecommerce and Pet Store Channel retailers and cannot shield its price discrimination by directing sales through H&C.  Even if a seller's direct sale may not qualify under the Robinson-Patman Act, downstream sales may qualify:

> If a seller can control the terms upon which a buyer once removed may purchase the seller's product from the seller's immediate buyer, the buyer once removed is for all practical, economic purposes dealing directly with the seller.  If the seller controls the sale, he is responsible for the discrimination in the sale price . . . .

*Purolator Prods., Inc. v. Fed. Trade Comm'n*, 352 F.2d 874, 883 (7th Cir. 1965).  To confine the Robinson-Patman Act solely to direct purchases would be "wholly an artificial [limitation] and is completely unwarranted by the language or purpose of the Act."  *Perkins v. Standard Oil Co.*, 395 U.S. 642, 647 (1969); *Am. News Co. v. Fed. Trade Comm'n*, 300 F.2d 104, 109-10 (2d Cir. 1962) (discrimination not shielded through wholesalers); *JAAAM, Inc. v. Exxon Mobil Corp.*, No. 06-cv-209, 2006 WL 8458011, at *4-5 (W.D. Pa. Sept. 20, 2006) (collecting pre- and post-*Illinois Brick* cases[5]).

Here, Ceva has charged H&C 28% to 95% more for Products sold to Ecommerce Channel retailers than to Pet Store Channel retailers.  This stark discrimination controls the terms for downstream sales and harms H&C's Ecommerce Channel customers by hindering their competitiveness, which in turn harms H&C's sales and its competition in distribution.

## C.    H&C Is Not Liable for Robinson-Patman Violations.

Without fully forming an argument, Ceva suggests that, if it violated the Robison-Patman Act, then "H&C would have violated the Robinson[-]Patman Act itself."  (Mot. at 14, 16.)  This

---

[5]       The limitation on indirect purchasers in the context of Sherman Act claims, *see Ill. Brick Co. v. Illinois*, 431 U.S. 720 (1977), does not apply in the context of a Robinson-Patman claim.  *See In re Brand Name Prescription Drugs Antitrust Litig.*, 878 F. Supp. 1078, 1083 (N.D. Ill. 1995) ("Robinson-Patman Act claims are not subject to the indirect purchaser rule of *Illinois Brick*." (citations omitted)).  If it did, a defendant like Ceva could evade liability by funneling discriminatory prices through a single seller like H&C.

makes no sense.  H&C is an unwilling victim of Ceva's price discrimination, and H&C has not

violated the Robinson-Patman Act.  H&C predicates its claim discussed in Section II.A on the

fact that it received *disfavored* pricing, and Section 2(f) imposes liability only on a *favored*

buyer.  *See, e.g.*, *Great Atl. & Pac. Tea Co., Inc. v. Fed. Trade Comm'n*, 440 U.S. 78, 82 (1979)

(discussing liability under 2(f) only in relation to the buyer receiving the "lower" price).  As for

the claim in Section II.B, the direct Ceva-H&C purchase-and-sale relationship cannot support

liability under Section 2(a), so it cannot support liability under Section 2(f).  *Id.* at 76.  Buyer

liability under Section 2(f) could attach only to a favored Pet Store Channel retailer, and only if

that retailer induced or knowingly received the favored pricing.[6]

Antitrust law in general, and the Robinson-Patman Act in particular, looks beyond

formalistic distinctions to analyze economic realities.  Here, Ceva imposed discriminatorily high

pricing on H&C for its sales to Ecommerce Channel customers, which has hurt competition

among Ecommerce Channel retailers and between Ecommerce Channel retailers and Pet Store

Channel retailers, and it has "tend[ed] to create a monopoly in [a] line of commerce"—the

Ecommerce Channel—now controlled by Ceva.  (Compl. ¶¶ 190, 194, 197-199.)  Because

Ceva's price discrimination has harmed H&C, H&C is entitled to pursue recovery against Ceva,

and its price discrimination claims under the Robinson-Patman Act should not be dismissed.

## III.   THE KANSAS ANTITRUST LAW WAS AMENDED TO PROVIDE A PRIVATE RIGHT OF ACTION FOR PRICE DISCRIMINATION.

Ceva offers no argument against H&C's state antitrust claim under K.S.A. § 50-149

except to say that "there is no private cause of action pursuant to that provision."  (Mot. 16-17.)

---

[6]      In any event, Ceva would find no defense in alleging that H&C violated the Robinson-Patman Act because the doctrine of *in pari delicto*—i.e., the doctrine "of equal fault"—does not support a defense to antitrust liability. *See Perma Life Mufflers, Inv. v. Int'l Parts Corp.*, 392 U.S. 134, 139-40 (1968).  Nor could Ceva mount a counterclaim under Section 2(f) since, of course, it cannot allege actionable harm arising from its own anticompetitive price discrimination.

Ceva's lone authority for this proposition is *Cease v. Safelite Glass Corp.*, 927 F. Supp. 1452 (D. Kan. 1996), where this Court concluded there was no private right of action under K.S.A. § 50-149 and that the Kansas Legislature could have provided a private right of action for Section 149 if it wished to. *Id.* at 1455-56.

Soon after *Cease*, the Legislature created a private right of action. *See* 2000 Kan. Laws Ch. 136 (West's 134) (H.B. 2855). A 2000 amendment, which dubbed the statute the Kansas Restraint of Trade Act ("KRTA"), added a new provision stating that an "action may be brought by any person who is injured in such person's business or property by reason of anything forbidden or declared unlawful by" the amended KRTA, which includes Section 149. K.S.A. §§ 50-158, -161(b). When the Kansas Supreme Court had occasion to construe the KRTA in 2013, it held that the 2000 amendment "authorizes a private right of action," "appl[ies] to all of KRTA," and "thus creates . . . new substantive rights." *O'Brien v. Leegin Creative Leather Prods., Inc.*, 277 P.3d 1062, 1074, 1084–85 (Kan. 2012).

Ceva overlooked the statute that squarely supports H&C's private right of action under K.S.A. § 50-149. Because Ceva raised no other arguments to dismiss this claim, and because H&C adequately alleged price discrimination between different Kansans purchasing Products in different sections of the State (Compl. ¶¶ 202-205), this claim should not be dismissed.

## IV.   CEVA BREACHED THE AGREEMENT, AND H&C HAS MULTIPLE REMEDIES AVAILABLE TO IT.

Ceva contends that the *Distribution* and *Supply* Agreement imposes a raft of distribution obligations on H&C but no corresponding supply obligations on Ceva. This is not how contracts work—certainly not this one, which expressly prohibits Ceva from undermining H&C's rights and duties. (Agmt. § 12.26.) Ceva therefore has breached the Agreement's express terms. Kansas also implies in every contract a duty or covenant to deal fairly and in good faith. Ceva

breached this implied obligation by unreasonably depriving H&C of the benefit of its Product-supply expectations and its distribution rights.  For these breaches, H&C seeks direct damages—including lost profits that flow directly from Ceva's breaches—and reliance damages, neither of which is barred by the Agreement.  Even so, if damages could not make H&C whole, it would be entitled to specific performance of the obligations Ceva has refused to honor since 2019.

### A. Ceva Breached Express Contract Terms, Insisting the Agreement Imposes Obligations Only on H&C, Not on Ceva.

Ceva has breached express contract terms governing Product supply and inventory, purchase order fulfillment, and H&C's exclusive distribution rights.

### 1. Product Supply and Inventory Requirements Bind Both Parties.

The Agreement imposes three obligations that govern Product supply and inventory:

- "The first four (4) months of each [12-month] forecast shall constitute a binding order and may not be subsequently revised ('***Binding Forecast***')."  (Agmt. § 3.1.)

- "At all times [H&C] shall maintain at least a three (3) month supply, per SKU, of Pheromone Products in inventory."  (Agmt. § 7.4.)

- "[H&C] shall purchase from Ceva[] a minimum annual quantity of the Product"—worth roughly $5 million per year.  (Agmt. § 3.4.1; *see also id.* §§ 3.4.2-3.4.4; Compl. ¶ 50.)

Ceva asserts that the Agreement "place[s] the[se] forecast, inventory, and annual purchase obligations squarely on H&C and not on Ceva."[7]  (Mot. at 17.)  Put differently, H&C has a duty to purchase Products, but Ceva has no duty to sell.  The plain language of the Agreement does not support Ceva's one-sided reading, nor do established canons of construction.

Section 3.1 states that near-term forecasts "shall constitute a binding order and may not be subsequently revised"—a clause that Ceva omits from its chart of disputed provisions (Mot. at 17-18).  By specifying no single party to be bound thereby, Section 3.1 binds both parties

---

[7]     Ceva concedes it may be bound by these provisions, but only in the context of a counterclaim.  (Mot. at 18.)  Ceva offers no authority for the notion that a contractual duty may arise only in the context of a counterclaim.

equally.  This makes sense.  Both parties must plan—Ceva for production, H&C for storage, marketing, and distribution—so they need certainty with respect to near-term sales volume. Ceva points out that "[n]o purchase order shall be binding on Ceva unless and until accepted by Ceva," but this provision is fully consistent with the Binding Forecast provision.  Binding Forecasts allow the parties to plan broadly for near-term sales volume, while purchase orders specify shipment allotments and delivery dates.  (Agmt. § 3.2.)

As for the minimum-inventory and minimum-annual-quantity obligations, H&C is required to purchase Products to satisfy those provisions, and those provisions carry the common-sense implied obligation that Ceva must sell what H&C must purchase.  If the parties signed a contract stating that "H&C will purchase from Ceva one piano worth $1,000 on January 1," Ceva could not show up on New Year's Day without a piano and say, "tough luck—you have to buy it, but we don't have to sell it."  That's not only common sense: Ceva represented and warranted that it would not "assume or undertake any obligation or commitment that is inconsistent with its obligations under, *or the terms and conditions of*, th[e] Agreement."  (Agmt. § 12.2.6 (emphasis added).)  To give meaning to the emphasized clause, this section must forbid Ceva from doing anything that would interfere with its own obligations *and* anything else—like withholding forecasted and ordered Products from H&C while supplying other distributors and retailers (Compl. ¶¶ 85, 227(e))—that is inconsistent with the terms that bind H&C.

Moreover, Ceva's reading would place all burdens on H&C and none on Ceva, which would render the Agreement illusory.  *See CIT Grp./Sales Fin., Inc. v. E-Z Pay Used Cars, Inc.*, 32 P.3d 1197, 1200-01 (Kan. Ct. App. 2001) ("Based upon a strict interpretation . . . [defendant] bears all of the contractual obligations, [but plaintiff] none [which creates] an illusory contract [that is] unenforceable.").  Whenever possible, Kansas law construes agreements to be non-

illusory and enforceable.  *Id.* at 1201 ("[C]ourts must endeavor to sustain a fairly executed agreement . . . whenever possible, rather than seeking to defeat the parties' intent by applying technical legal rules.").  Here, the Court can achieve this objective by applying general obligations to both parties and simply confirming Ceva's obligation to sell what H&C must buy.[8]

> ### 2.      The Pleadings Adequately Allege That Ceva Breached the Agreement by Failing to Honor Purchase Orders It Had Accepted.

Ceva also breached the Agreement by reneging on purchase orders that it had already accepted under Section 3.2 of the Agreement.  (Compl. ¶ 227(d) (Ceva "delay[ed] and under-deliver[ed] Product orders, even after accepting those orders and committing to fill them."); *id.* ¶¶ 69, 72, 76.)  Ceva argues that these allegations are conclusory because H&C "fails to identify a single order that was accepted and then delayed, under-delivered, modified, or rejected."  (Mot. at 20.)  Although H&C could provide these details if needed, it "is not required to allege the granular detail urged by Defendant in its motion [and] need not identify specific purchase orders that were not fulfilled."  *No Spill, Inc. v. Scepter Canada, Inc.*, 429 F. Supp. 3d 768, 780 (D. Kan. 2019).  H&C's detailed allegations as to the time and nature of the alleged conduct are "sufficient to provide Defendant notice of its claim[]" that Ceva reneged on accepted orders.  *Id.*

> ### 3.      Ceva Violated H&C's Exclusive Distribution Rights by Selling Products Directly to Pet Store Channel Customers.

Under the Agreement, H&C alone may sell Products to Pet Store Channel customers. (Agmt. § 2.1.)  Yet Ceva has "commercialized"—i.e., directly or indirectly marketed, sold, or had someone else sell—"Products in the Pet Store Channel in violation of H&C's exclusive

---

[8]      Ceva insinuates that, if anyone has breached the Agreement, it's H&C, because H&C has failed to satisfy its inventory and purchase obligations.  But Ceva explains that it "has waived those provisions and not claimed breach by H&C."  (Mot. at 18-19.)  This "concession" illustrates the absurdity of Ceva's position.  Taking Ceva's argument to its conclusion, Ceva could decline to satisfy H&C's orders with impunity and then sue H&C for failing to meet its inventory and purchase requirements.  This is nonsense on stilts.  The only rational reading requires Ceva to supply what H&C is required to order and hold in inventory.  This also comports with § 12.2.6.

distribution rights." (Compl. ¶ 227(f); Agmt. § 1.8.) Ceva argues that this claim is not actionable because one of H&C's examples of Ceva's improper commercialization efforts involves co-branded Products, "ThunderEase, Powered by Feliway" and "ThunderEase, Powered by Adaptil." (Mot. at 20 (citing Compl. ¶ 95).) But Ceva does not and cannot take issue with the broader allegation that it "has started to market and sell Products in the Pet Store Channel." (Compl. ¶¶ 85, 95.) This alleged fact—which is not limited to co-branded Products— demonstrates that Ceva violated H&C's "exclusive right to Commercialize the Product in and through" the Pet Store Channel. (Agmt. § 2.1.)

But even if H&C had alleged only that Ceva sold Products in co-branded packaging, that would be enough. Ceva cannot end-run H&C's exclusive distribution rights by changing Product packaging and selling Products itself. (Agmt. § 12.2.6.) This would render H&C's core exclusivity right meaningless. *Forrest Energy, L.L.C. v. Seib*, 166 P.3d 449, at *5 (Kan. Ct. App. 2007) (table decision) ("[M]eaning will be given to every part of a contract if possible, rather than a construction adopted that will render some portions doubtful or useless."). Ceva's position also conflicts with the express scope of H&C's right. H&C was required to maintain substantial inventory of "Pheromone Products," and its corresponding exclusive distribution rights, starting in 2018, related to "Pheromone Products." (Agmt. §§ 2.1, 7.4.) Pheromone Products include the "Ceva branded pheromone products Adaptil and Feliway and any other additional Ceva branded pheromone products on Appendix A." (Agmt. § 1.30.) Coupling this definition with the broad definition of "commercialize," which covers even indirect efforts to sell Products, the "Powered by" Products clearly fall under the Agreement. Ceva breached the Agreement by selling and otherwise commercializing those Products in the Pet Store Channel.

H&C has pleaded specific factual allegations showing that Ceva violated its express

contractual obligations.  For this reason, Claims 5 and 6 should not be dismissed.

### B.   Ceva Breached Its Duty to Perform Fairly and in Good Faith Under the Agreement.

Broadly speaking, Ceva has prevented H&C from obtaining the benefit of its bargain by

imposing discriminatory and exorbitant price increases, refusing to supply H&C with sufficient

Products to meet retail demand, and continuing to sell Products to others before selling to H&C

while using H&C's proprietary information and customer data, not just sales data, to bolster

Ceva's sales.  (Compl. ¶¶ 72-98, 234.)  Ceva's conduct transcends the violation of a single

express term and undermines the foundation and purpose of the Agreement.  "Kansas recognizes

a duty of good faith and fair dealing is embedded in every contract . . . ."  *Trear v. Chamberlain*,

425 P.3d 297, 304 (Kan. 2018).  This forbids a party from

> intentionally and purposely do[ing] anything to prevent the other party from
> carrying out his part of the agreement, or do[ing] anything which will have the
> effect of destroying or injuring the right of the other party to receive the fruits of
> the contract.  Ordinarily if one exacts a promise from another to perform an act,
> the law implies a counterpromise against arbitrary or unreasonable conduct on the
> part of the promisee.

*Waste Connections, Inc. v. Ritchie Corp.*, 296 Kan. 943, 965 (Kan. 2013) (citations omitted).

This duty bears such weight that it may be employed to "override express contract terms" that

conflict with it.  *Kan. Baptist Conv'n v. Mesa Op. Ltd. P'ship*, 253 Kan. 717, 724-26 (Kan.

1993).  Ceva's alleged sweeping misconduct breaches the duty of good faith and fair dealing.

Ceva's first objection appears to be that H&C's claim for breach of the implied duty

should not stand as its own cause of action.  (Mot. at 22.)  H&C sees no reason that such a

formalistic objection would warrant dismissal, and the objection is not well founded.  Kansas

courts, including the state supreme court, recognize standalone claims for breach of the implied

duty.  *See, e.g.*, *Law v. Law Co. Bldg. Assocs.*, 295 Kan. 551, 578 (Kan. 2012) (remanding for

consideration the "separate and independent claims for breach of the implied duty of good faith and fair dealing, breach of contract, and declaratory judgment").

Ceva next insists that no implied duty arises without "a contractual provision that has been breached." (Mot. at 22.) This rule is at odds with the Kansas Supreme Court's conclusion that the implied duty may override even express contractual terms, *Kan. Baptist*, 253 Kan. at 724-26, and it finds no support in Ceva's cited cases. (Mot. at 22 (citing *Integon Indem. Corp. v. Thorup Bldg. & Design, Inc.*, No. Civ. A. 89-2005-O, 1989 WL 75630, at *2 (D. Kan. June 29, 1989) (relying on state court's interpretation of implied duty from U.C.C. rather than broader common law duty)).) In any event, H&C's claims all address Ceva's failure to perform fairly and in good faith in relation to specific provisions governing Binding Forecasts (Agmt. § 3.1), accepted orders (*id.* § 3.2), minimum annual sales quantities (*id.* § 3.4.1), Product-inventory levels (*id.* § 7.4), price increases (*id.* § 5.1), and prioritization of H&C's product orders (*id.* § 12.2.6). To the extent these terms "exact[] a promise from [H&C] to perform an act" like submitting Binding Forecasts, ordering minimum quantities, and carrying adequate inventory, "the law implies a counterpromise against arbitrary or unreasonable conduct on the part of" Ceva. *Waste Connections*, 296 Kan. at 965. Because Ceva has "prevented [H&C] from carrying out" the cited terms and has "destroy[ed] or injur[ed] the right of [H&C] to receive the fruits of" these provisions, Ceva has breached its implied duty of good faith and fair dealing. *Id.*

Ceva takes special issue with the allegation that it abused its discretion to raise Product prices, arguing that "Kansas law does not recognize a claim for breach of the implied covenant" if "the contract leaves the challenged action to the sole discretion of a party." (Mot. at 23.) This sweeping rule has no support, even in Ceva's cited case. The Court in *Wayman v. Amoco Oil Co.* discussed whether the implied duty of good faith and fair dealing should apply to a contract

term that endows one party with "uncontrolled discretion."  923 F. Supp. 1322, 1355 (Kan. 1996).  But, critically, (1) Ceva enjoys only "discretion," not "uncontrolled discretion," to raise prices (Agmt. § 5.1), and (2) the Court in *Wayman* ultimately held that, even where a party is endowed with sweeping discretion, it may not defy the "reasonable expectation that [it] could not abuse its discretion in carrying out the policy."  923 F. Supp. at 1356-57.  The federal court in *Wayman* rejected Ceva's rule, as do Kansas state courts.  *CIT Grp./Sales*, 2 P.3d at 1201 (holding that party still must "exercise its discretion . . . in good faith" even where financing decision was left to party's "sole discretion").

Ceva has violated its implied duty to perform the terms of the Agreement fairly and in good faith, and the allegations in the Complaint show this with specificity.  Claims 5 and 7 should not be dismissed.

### C.     The Contract Does Not Bar the Relief that H&C Seeks.

H&C seeks direct expectation damages, reliance damages, and specific performance as a remedy for Ceva's breaching conduct.  The Agreement does not bar this relief.

### 1.     H&C Seeks Lost Profits Arising Directly from Ceva's Breach.

Ceva argues that H&C may not recover lost profits under the Agreement because they fall within the Agreement's bar on consequential damages.  (Mot. at 25-27.)  But "[l]ost profits . . . can be recoverable as a component of either (and both) direct and consequential damages." *Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1156 (10th Cir. 2007) (citing *Source Direct, Inc. v. Mantell*, 870 P.2d 686, 693 (Kan. Ct. App. 1994)).  Here, the Agreement bars only consequential lost profits, and H&C seeks direct lost profits.

The Agreement's limitation of liability, Section 13.6, addresses special and consequential damages.  It prohibits a claim for "lost profits, or *any other* special, punitive, indirect, consequential or incidental damages."  (Agmt. § 13.6 (emphasis added).)  In this provision, the

use of the phrase "any other" causes the modifiers "special, punitive, indirect, consequential or incidental" to modify both the term they precede, "damages," and the term they follow, "lost profits."  A contrary reading makes no sense—e.g., one would never refer to "the number 4 and any other odd, double-digit numbers."  Given the subject matter and the syntax of Section 13.6, as well as Ceva's evident ability to more broadly limit its damages exposure in the context of indemnification (Agmt. § 13.1 (covering "any . . . damages, losses, liability")), the Agreement's limitation of liability should be read to bar only consequential lost profits.  *Penncro*, 499 F.3d at 1156-57 (applying Kansas law).

H&C seeks direct lost profits, which are lost profits that the parties anticipated would be earned under the contract.  *Id.* at 1156 (distinguishing lost profits from a breached services contract that anticipated a profit from those services (direct) from lost profits caused when a breach has the "knock-on" effect of causing a party to close its doors, precluding it from performing *other* contracts that would have generated profits (consequential)).  Here, the Agreement expressly contemplated that H&C would generate profits and keyed H&C's obligations to gross revenue and profits under the Agreement.  (Agmt. § 6.4 (tying H&C's marketing obligations from gross Product sales under the Agreement).)  H&C earned profits directly by performing its obligations under the Agreement: by distributing and selling Products.[9]

---

[9]      *Penncro* is the leading Tenth Circuit case on this rule, but lost profits like those H&C has suffered are widely regarded as direct damages.  *See, e.g.*, *Claredi Corp. v. SeeBeyond Tech. Corp.*, 2010 WL 1257946, at *1-2, *6 (E.D. Mo. Mar. 26, 2010) (plaintiff's lost profits on third-party sales of its software were direct damages); *Valve Corp. v. Sierra Entm't Inc.*, 431 F. Supp. 2d 1091, 1101-02 (W.D. Wash. 2004) ("general damages" "includ[e] [lost third-party] profits and advantages which are [the contract's] direct result"); *Biovail Pharm. v. Eli Lilly & Co.*, 2003 WL 25901513, at *3 (E.D.N.C. Feb. 28, 2003) (lost profits are direct damages if they are the highly probable result of the breach); *Biotronik A.G. v. Conor Medsys. Ireland, Ltd.*, 22 N.Y.3d 799, 806, 808-09 (N.Y. 2014) (lost profits from third-party sales are direct damages where they are "the direct and immediate fruits of the contract"); *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 515 N.E.2d 61, 67 (Ill. 1987) (lost profits are direct damages where the very purpose of the contract—to provide a Yellow Pages listing—was to increase profits); *Bonanza Rest. Co. v. Wink*, 2012 WL 1415512, at *3-4 (Del. Super. Ct. Apr. 17, 2012) (awarding direct damages for loss of royalty payments from third parties when defendant breached franchise agreement aimed at obtaining royalties from third parties); *Acker Constr. v. Tran*, 396 S.W.3d 279, 288-89 (Ark. Ct. App. 2012) (lost profits from chicken sales to third parties were direct damages).

The arrangement contemplated by the Agreement—whereby H&C distributed and sold Ceva's products, tracked and reported those sales, and tied its subsequent performance under the Agreement to those sales and revenues—stands in stark contrast to the straightforward sale-of-goods transactions in the cases Ceva cites.  In *Tongish v. Thomas*, 840 P.2d 471, 472 (Kan. 1992), *Panhandle Agri-Serv. Inc. v. Becker*, 644 P.2d 413, 415 (Kan. 1982), and *No Spill* 429 F. Supp. 3d at 774-75, the buyers bought goods to use as they saw fit to meet their own needs. Here, H&C did not contract simply to buy products from Ceva but to represent Ceva in the market and to develop Ceva's brand and to bolster sales of Products both for Ceva and H&C. H&C could not have performed the Agreement if it did not distribute and sell Ceva's products. Thus, when breaches by Ceva prevented H&C from performing and obtaining its benefit under the Agreement, lost profits resulted directly.  H&C's lost profits from sales that it was entitled to make under the Agreement, but that Ceva has prevented through its breaching conduct, are direct damages and are not barred by the limitation of liability.

> **2.      H&C Also Can Recover Reliance Damages for Investments Required by the Agreement That Ceva's Breaches Rendered Valueless.**

H&C also is entitled to recover reliance damages for millions of dollars of now-wasted marketing investments required under the Agreement and expended in reliance on H&C's multi-year distribution rights.  *See Source Direct*, 870 P.2d at 408-09.  H&C has pleaded this harm (Compl. ¶¶ 56, 164), and it should be permitted to seek reliance damages for the unnecessary losses it incurred as a result of Ceva breaching its supply obligations and other provisions of the Agreement.

> **3.      If Damages Are Inadequate to Make H&C Whole, the Court May Order Ceva to Specifically Perform Its Obligations.**

Finally, to the extent damages may not make H&C whole, it is entitled to specific performance of Ceva's obligations under the Agreement.  *See Pepsi-Cola Bottling Co. v. Bottling*

*Grp., L.L.C.*, No. 07-2315-JAR, 2008 WL 234326, at *4 (D. Kan. Jan. 28, 2008).  Even if damages are available in part, the Court may award specific performance to remedy any aspect of H&C's injury that is not amenable to a damages award.  *See Salt Lake Trib. Pub. Co., LLC v. AT&T Corp.*, 320 F.3d 1081, 1102 (10th Cir. 2003).  Ceva challenges H&C's claim for specific performance only inasmuch as Ceva contends that H&C has not alleged a breach.  (Mot. at 17.) For the reasons set forth above in Sections IV.A and IV.B, the premise for Ceva's objection to specific performance is unfounded.  In one form or another, contractual remedies are available to H&C.  None of its contract claims should be dismissed for want of damages or an appropriate remedy.

## <u>CONCLUSION</u>

For the reasons set forth above, H&C respectfully requests that the Court deny Ceva's motion to dismiss.

DATED this 10th day August, 2020.

Evans & Mullinix, P.A.

/s/ *Colin N. Gotham*

David R. Schapker
Colin N. Gotham KS # 19538
7225 Renner Road, Suite 200
Shawnee, Kansas 66217
Telephone: 913.890.7009
Facsimile: 913.962.8701
dschapker@emlawkc.com
cgotham@emlawkc.com

Holland & Hart LLP

James E. Hartley (*pro hac vice*)
1800 Broadway, Suite 300
Boulder, Colorado 80302
Telephone: 303.245.2075
Facsimile: 303.473.2720
jhartley@hollandhart.com

Paul D. Swanson (*pro hac vice*)
555 17th Street, Suite 3200
Denver, Colorado 80202
Telephone: 303.295.8578
Facsimile: 303.416.8814
pdswanson@hollandhart.com

Eric Maxfield (*pro hac vice*)
Brandon T. Christensen (*pro hac vice*)
222 South Main Street, Suite 2200
Salt Lake City, Utah 84101
Telephone: 801.799.5882
Facsimile: 801.618.3832
egmaxfield@hollandhart.com
btchristensen@hollandhart.com

**Attorneys for Plaintiff**
**H&C Animal Health, LLC**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused the foregoing brief to be served through a Notice of

Electronic filing for all parties and attorneys appearing in this case.

DATED: August 10, 2020

*  /s/ Colin N. Gotham        *