IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

H&C ANIMAL HEALTH, LLC,

        Plaintiff,

v.                                Case No.  20-2271-JWB

CEVA ANIMAL HEALTH, LLC,

        Defendant.

**MEMORANDUM AND ORDER**

This matter comes before the court on Defendant's motion to dismiss (Doc. 20).  The motion has been fully briefed and the court is prepared to rule. (Docs. 21, 27, 33.)  For the reasons stated herein, Defendant's motion is GRANTED IN PART and DENIED IN PART.

## I.     Facts

The facts set forth herein are taken from the allegations in the complaint, including the attached exhibits.  Plaintiff H&C Animal Health, LLC, is a distributor of over-the-counter pet products.  Plaintiff does not manufacture the products but sells them to brick-and-mortar stores and through the online marketplace.  Plaintiff is a distributor for Defendant Ceva Animal Health, LLC.  Defendant develops and manufactures animal pharmaceuticals and provides related services and equipment.  Defendant's products are pheromone-based pet-behavior products that are used to calm or modify anxious behavior in pets.  Defendant's products comprise 75 to 90 percent of the domestic market for pheromone-based pet-behavior products.  (Complaint at ¶¶ 1, 2.)  The complaint identifies several different lines of products that have been developed by Defendant for dogs and cats.  Many of these products have been patented by Defendant.  (*Id.* at ¶ 33.) Defendant's trademarks include the following: Adaptil; Catego; Feliway; Senilife; and Urine

1

Away.  (Doc. 1, Exh. 1, App. B.)  Defendant's products make their way to consumers through brick-and-mortar stores, online platforms, and veterinarians.

In 2017, the parties entered into a distribution and supply agreement (the "agreement"). (Doc. 1, Exh. 1)(cited throughout as "Agmt.")  That agreement allows Plaintiff to sell Defendant's products, which were identified in an appendix to the agreement, through certain channels.  (*Id.* at 4, App. A.)  Under the agreement, Plaintiff held exclusive distribution rights for pet stores and their online sales platforms, which is referred to as the "Pet Specialty Channel" and "Independent Retail Channel." (*Id.* at 4-5.)  The complaint refers to these channels as the "Pet Store Channel."[1] (Complaint at ¶ 38.)   Plaintiff's territory under the agreement specifically excluded sales through veterinarians or veterinary distributors.  (Agmt. at § 1.38.)  With respect to online platforms, which the complaint refers to as the "Ecommerce Channel," the agreement authorized Plaintiff to sell and advertise in that channel, but it did not provide exclusivity.  Rather, Plaintiff had to compete with other distributors and Defendant in the Ecommerce Channel.  (Complaint at ¶ 42.)

The agreement requires Plaintiff to market Defendant's products.  (Agmt. at Art. 6.) Plaintiff alleges that it invested more than seven million dollars in promoting and selling the products.  Plaintiff developed relationships with product sub-distributors and retailers, including entering into separate contracts to supply those entities.  (Complaint at ¶ 55.)

The agreement requires Plaintiff to provide Defendant with a twelve-month forecast (the "forecast") for product sales.  Plaintiff is to update the forecast every month.  The first four months of the forecast constitute a "binding order and may not be subsequently revised ('Binding Forecast')."   (Agmt. at § 3.1.)  The forecasts specify product stock keeping unit ("SKU") and do not differentiate between products for the Pet Store Channel or the Ecommerce Channel.  (*Id.*)

---

[1] For ease of reference, the court will also use this term to refer to the two types of pet store channels contained in the agreement.

Plaintiff is also required to maintain at least a three-month supply of products based on sales during the preceding ninety days.  (*Id.* at § 7.4.)  The agreement further requires Plaintiff to purchase a minimum annual quantity of the product, which is approximately five million dollars.  (*Id.* at § 3.4; Complaint at ¶ 50.)  Plaintiff is also required to report sales data upon request from Defendant. (Agmt. at § 7.5.)  The agreement terminates on December 31, 2020.  Both parties represented that they would not assume or undertake any obligation or commitment that is inconsistent with the obligations under the agreement.  (*Id.* at §§ 12.1.5, 12.2.6.)

After execution of the agreement, Plaintiff invested in promoting the products and selling the products.  Plaintiff complied with its obligation to submit the Binding Forecasts and purchase orders.  Defendant pressured Plaintiff to order, distribute, and sell more products, telling Plaintiff that it should sell up to thirty million dollars of products each year.  This plan was pressed until early 2019.  Also, up to the spring of 2019, Defendant confirmed Plaintiff's purchases orders via email without delay.  Until that time, Defendant supplied the products to meet Plaintiff's Binding Forecasts and purchase orders.  (Complaint at ¶¶ 57-61.)

At some point in 2019, Defendant purchased ThunderWorks, a manufacturing competitor. ThunderWorks sold its own line of pheromone-based pet-behavior products that were branded as ThunderEase and also sold a ThunderShirt for pets to wear that would increase their sense of security and calm.  Plaintiff and Defendant's relationship turned acrimonious after Defendant acquired ThunderWorks.  (*Id.* at ¶ 63.)  Plaintiff initiated a call with Defendant to address this issue.  Defendant's representative, Phil Blizzard, told Plaintiff's representatives that the call "will not go well for you."  (*Id.* at ¶ 64.)  On the call, Blizzard stated that Defendant was not satisfied with the pricing on its products and "wanted to avoid a race to the bottom."  (*Id.* at ¶ 66.)  Blizzard told Plaintiff's representatives that it could not win a price war with Defendant and Defendant was

going to control sales and raise prices for products sold in the Ecommerce Channel.  Plaintiff was also told that it would be excluded from distributing in the Ecommerce Channel in future arrangements.  (*Id.* at ¶ 67.)

Plaintiff alleges that Defendant breached the agreement in mid-2019 by disregarding Binding Forecasts, reducing purchase orders, and shorting purchase orders.  To the detriment of Plaintiff and its customers, Defendant failed to deliver products that were ordered even though Defendant had accepted the purchase orders.  (*Id.* at ¶ 72.)  Defendant also began requiring that Plaintiff identify where its products were going to be sold, in the Pet Store or Ecommerce Channel, although the agreement does not require Plaintiff to report this information.  (*Id.* at ¶ 88.)

With respect to Defendant's alleged failure to fulfill purchase orders, Plaintiff alleges that the number of products supplied to it fell precipitously after the purchase of ThunderWorks. Between January 2018 and March 2019, Defendant filled more than 90 percent of Plaintiff's purchase orders.  That percentage continued to fall.  From April 2019 through August, the fulfillment rate fell to 77.7 percent.  From September 2019 through March 2020, the fulfillment rate was 44.6 percent.  (*Id.* at ¶ 75.)  In the first three weeks of March 2020, Defendant reduced Plaintiff's orders to 20 percent of the product ordered.  As a result, Plaintiff was unable to maintain a three-month inventory as required by the agreement.  (*Id.* at ¶ 77.)  The drastic reduction of product supply has also reduced Plaintiff's sales in the Pet Store Channel by over 50 percent.  (*Id.* at ¶ 138.)  Plaintiff alleges that Defendant refused to deal with Plaintiff - by not supplying product - so that Defendant could gain monopoly power and raise prices.

Moreover, this forced Plaintiff to direct all inventory to Pet Store Channel customers due to Plaintiff's contracts with those customers which substantially hindered Plaintiff's ability to compete in the Ecommerce Channel.  (*Id.* at ¶ 81.)  This also caused Plaintiff to default on its

obligations to its customers resulting in more than one million dollars in penalties and fines under those agreements.  Defendant has asserted a lack of products as the basis for the failure to provide Plaintiff with products.  Plaintiff alleges that this assertion is a "specious justification" and that Defendant has been marketing and selling products in the Pet Store Channel.  (*Id*. at ¶ 85.)

Plaintiff further alleges a breach of the agreement due to product price increases. Defendant increased the prices on its products by up to 95%.  In doing so, Defendant also initiated a rebate program and offered a rebate to Plaintiff to cover "nearly the entire price increase" if the products were sold in the Pet Store Channel.  (Complaint at ¶ 89; Exh. 2.)  Plaintiff alleges that the rebate is not tied to any increase in cost to sell in the Pet Store Channel as opposed to the Ecommerce Channel.  Essentially, Plaintiff contends that this rebate is pretextual and offered to cover price discrimination so that it cannot compete against Defendant in the Ecommerce Channel. (Complaint at ¶ 90.)  In selling in the Ecommerce Channel, Plaintiff alleges that Defendant has been selling its products to and through online retailers, such as Amazon.com, for a price that is lower than the price charged to Plaintiff after the price increase.  (*Id.* at ¶¶ 157-58.)  Plaintiff alleges that Defendant has raised the prices in order to "edge out competition from" Plaintiff.  (*Id.* at ¶ 91.)  As a result, Plaintiff is unable to compete on price in the Ecommerce Channel and its revenues and profits have been reduced.

With respect to the Pet Store Channel, Plaintiff alleges that Defendant has entered the channel and is marketing and promoting sales of products without involving Plaintiff.  Defendant has done this by using its acquisition of ThunderWorks.  Plaintiff alleges that this violates the agreement as Plaintiff was the exclusive distributor for that channel.  (*Id.* at ¶¶ 71, 95.)  Defendant marketed and sold the products under the branding of "ThunderEase," but the products were co-branded and also identified Defendant's trademarks.  For example, the ThunderEase calming spray

also included the branding "Powered by Feliway."  (*Id.* at ¶ 95.)  Although the products have different packaging than Defendant's products that were sold and marketed by Plaintiff, the co-branded products allegedly do not differ in that they both have the same pheromone-based pet-behavior products with the same characteristics.  (*Id.* at ¶ 153.)  Plaintiff alleges that Defendant used the proprietary information regarding sales data to undercut Plaintiff in the Pet Store and Ecommerce Channels.  (*Id.* at ¶ 96.)

Plaintiff alleges that Defendant's conduct has restrained price competition and, as a result, "deprived consumers of choice and cleared the way for higher product prices."  (*Id.* at ¶ 98.) Defendant has allegedly engaged in this conduct to obtain monopoly power in the Ecommerce Channel for pheromone-based behavior products.  Defendant has allegedly achieved and maintained this monopoly power by refusing to deal with its distributors, such as Plaintiff, and implementing a discriminatory pricing scheme.  (*Id.* at ¶¶ 122-23.)  Plaintiff also alleges that Defendant has cut off Lambert, another distributor.  (*Id.* at ¶ 135.)

Plaintiff alleges that Defendant did not have a natural monopoly over the distribution and sale of its products due to its agreement with Plaintiff and with other distributors.  Defendant contracted with Plaintiff so that Plaintiff would market the products and, in exchange, have the right to distribute the products.  Plaintiff alleges that with the purchase of ThunderWorks Defendant is able to raise its prices and not see a shift in demand.  This is because Defendant has obtained a dominant market share in the industry.  (*Id.* at ¶ 117.)  According to Plaintiff, consumers have strong brand loyalty because they are disinclined to try another brand if the product is working for their pets.  Other manufacturers have barriers to enter the market due to this brand loyalty and the cost to develop these types of products.  (*Id.* at ¶¶ 110-11.)

According to the complaint, Defendant's actions in raising prices to Plaintiff, and other distributors, resulted in a loss of profits to both parties. Defendant has "sacrificed" profits in the short-term in order to achieve the monopoly power in the Ecommerce Channel. (*Id.* at ¶ 141.) Defendant has lost sales through Plaintiff and Lambert in the products that they distribute in the Ecommerce Channel. Defendant has also lost sales in the Pet Store Channel by reducing the product distributed to Plaintiff. Although Defendant has entered the Pet Store Channel through co-branding the ThunderWorks' products, Plaintiff alleges that Defendant does not yet have the network for distributions that Plaintiff has in that channel. Plaintiff alleges that Defendant's short-term losses in the first three months of 2020 were almost four million dollars. (*Id.*)

Plaintiff has suffered losses in sales, margins, and profits. Plaintiff has also lost millions of dollars in marketing that was required under the agreement. Plaintiff further alleges that Defendant has achieved its goal of obtaining monopoly power. (*Id.* at ¶¶ 165-67.)

Plaintiff alleges that Defendant's sales account for approximately $50 million out of a total United States market between $55 and $65 million for pheromone-based pet-behavior products. (*Id.* at ¶ 103.) Defendant has used its new monopoly power to raise prices for Plaintiff and for consumers in the Ecommerce Channel, which is an alleged sub-market of the relevant market. (*Id.* at ¶¶ 104-06.) The price increase on some products is allegedly more than 100% to consumers. (*Id.* at ¶ 107) Plaintiff alleges that Defendant's monopoly power is shown by the market data and its ability to increase prices substantially without a loss of demand. Moreover, there "are few, if any, reasonably interchangeable products for [Defendant's] products." (*Id.* at ¶ 117.) As shown in the complaint, Defendant has significantly increased its advertised price for its products sold in the Ecommerce Channel from August 15, 2019, through May 2020. The price increases range

from 31 to 563 percent.  (*Id.* at ¶ 167.)  Plaintiff alleges that Defendant now controls more than 75 percent of the market in the Ecommerce Channel.  (*Id.* at ¶ 172.)

Plaintiff filed this action on May 28, 2020, alleging the following claims under federal and state law: 1) monopolization under the Sherman Antitrust Act, 15 U.S.C. § 2; 2) alternatively, a claim for attempted monopolization under the Sherman Antitrust Act; 3) price discrimination under the Robinson-Patman Act, 15 U.S.C. § 13(a) and (c); 4) price discrimination under the Kansas Restraint of Trade Act, K.S.A. 50-149; 5) a claim for specific performance under K.S.A. 2-716; 6) breach of contract; and 7) breach of the implied covenant of good faith and fair dealing.

Defendant now moves to dismiss Plaintiff's complaint (Doc. 20).  The court will address Defendant's arguments in turn.

## II.    Standard

In order to withstand a motion to dismiss for failure to state a claim, a complaint must contain enough allegations of fact to state a claim for relief that is plausible on its face.  *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1974 (2007)).  All well-pleaded facts and the reasonable inferences derived from those facts are viewed in the light most favorable to Plaintiff.  *Archuleta v. Wagner*, 523 F.3d 1278, 1283 (10th Cir. 2008).  Conclusory allegations, however, have no bearing upon the court's consideration.  *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007).

Plaintiff has alleged claims under both federal and state law.  Although federal substantive law will apply to Plaintiff's claims under federal laws, the court finds that Kansas law applies to Plaintiff's state law claims.  The agreement at issue in this case includes a Kansas choice of law provision.  (Agmt. at § 11.1.)  Therefore, Kansas law will apply to the state claims.  *See Brenner v. Oppenheimer*, 273 Kan. 525, 538, 44 P.3d 364, 374 (2002).

### III.    Analysis

### A.  Sherman Act Claims

Defendant moves for dismissal of Plaintiff's claims under the Sherman Act for monopolization or attempted monopolization on the basis that Plaintiff has failed to plead an anticompetitive act giving rise to liability under the Act.  The monopolization claims are based on Defendant's monopolization or attempted monopolization of the Ecommerce Channel submarket. (Complaint at ¶¶ 171-88.)  Section 2 of the Sherman Act, 15 U.S.C. § 2, makes it unlawful to "monopolize" or "attempt to monopolize."  Section 2 does not prohibit the possession of monopoly power and the charging of monopoly prices, as the Supreme Court has recognized that monopoly power is "an important element of the free-market system."  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). ("The opportunity to charge monopoly prices—at least for a short period—is what attracts 'business acumen' in the first place; it induces risk taking that produces innovation and economic growth.").

To prove its claims under Section 2, Plaintiff must do more than show that Defendant has a monopoly.  To succeed on a monopolization claim, Plaintiff must establish both "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*, 841 F.3d 827, 841 (10th Cir. 2016).  The second element is the anticompetitive conduct.  To establish attempted monopolization, Plaintiff must show (1) anticompetitive conduct, (2) a specific intent to monopolize, and (3) a dangerous probability of achieving monopoly power in a relevant market.  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).  Both claims require

Plaintiff to establish anticompetitive conduct.  In its motion to dismiss, Defendant challenges the sufficiency of the allegations as to the anticompetitive conduct.

"So what exactly qualifies as anticompetitive conduct under section 2, properly understood?  It's been said that anticompetitive conduct comes in too many forms and shapes to permit a comprehensive taxonomy."  *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013) (Gorsuch, J.) (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767–68 (1984); *Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1087 (D.C. Cir. 1998).  Over time, it has been found to include activities by the monopolist such as limiting the ability of third parties to deal with rivals, requiring third parties to purchase a bundle of goods (tying), defrauding regulators, and refusing to deal with rivals.  *Id.* at 1072, 1074. Generally, however, "purely unilateral conduct does not run afoul of section 2 – 'businesses are free to choose' whether or not to do business with others and free to assign what prices they hope to secure for their own products."  *Id.* at 1072 (citing *Pac. Bell Tel. Co. v. Linkline Commc'ns*, 555 U.S. 438, 448 (2009)).  "[T]he Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Trinko*, 540 U.S. at 408 (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)).

Plaintiff proceeds in this case under a limited exception to this general rule, that Defendant violated § 2 by refusing to deal with Plaintiff.  *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985); *Novell, Inc.*, 731 F.3d at 1074 (reiterating that *Aspen Skiing* is a "limited exception to the general rule of firm independence.").  In *Aspen Skiing*, the parties were competitors with defendant having a larger market share by controlling three of four ski mountains in a certain area and the plaintiff controlled the remaining one.  *Id.* at 593-94.  For several years,

10

the parties had shared profits as a result of jointly issuing all-mountain ski passes. A dispute arose when the defendant demanded that the plaintiff accept a lower percentage of profits from the joint pass. The plaintiff refused and the defendant stopped participating in the joint pass. The plaintiff then tried to recreate the joint pass by purchasing tickets from the defendant at retail price for its customers. The defendant, however, refused to honor these tickets. The Supreme Court held that this was an anticompetitive refusal to deal. *Id.* at 608-11. The Supreme Court later expressed that *Aspen Skiing* is the "leading case for § 2 liability based on refusal to cooperate with a rival" and that it "is at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 408-09.

The Tenth Circuit has required a plaintiff seeking to invoke *Aspen Skiing's* limited exception to show the following: 1) "a preexisting voluntary and presumably profitable course of dealing between the monopolist and rival" and 2) "the monopolist's discontinuation of the preexisting course of dealing must suggest a willingness to forsake short-term profits to achieve an anti-competitive end." *Novell, Inc.*, 731 F.3d at 1074-75 (internal quotations and citations omitted). Defendant argues that Plaintiff's allegations do not plausibly allege either element.

With respect to the first showing, Defendant asserts that Plaintiff was not a rival or competitor at the time the parties entered into the voluntary course of dealing. The Supreme Court has made it clear that a plaintiff must allege that the monopolist "voluntarily engaged in a course of dealing with its rivals." *Trinko*, 540 U.S. at 409. Plaintiff has not alleged that it was a competitor of Defendant prior to their agreement in that Plaintiff has not alleged that it competed with Defendant by selling other pet pheromone products in the Ecommerce Channel prior to the agreement. Defendant argues that Plaintiff has not provided any authority to support a finding that a distributor is a competitor or rival of its supplier under *Aspen Skiing*.

11

In response, Plaintiff cites several cases that it asserts supports its position.  They do not. Plaintiff initially cites to *Foam Supplies, Inc. v. The Dow Chemical Co*., No. 05-cv-1772, 2006 WL 2225392, at *1 (E.D. Mo. Aug. 2, 2006).   In that case, the products were chemicals manufactured by the defendant.  The plaintiff resold those products and also used the products to manufacture polyurethane foam systems.  The plaintiff competed with the defendant through its subsidiary in the polyurethane foam market.  As noted by Defendant, the court analyzed the facts in that case under a price squeeze theory, which is no longer actionable. *See Pac. Bell Tel. Co*., 555 U.S. at 450-53. In any event, *Foam Supplies* is clearly  distinguishable because the defendant had entered into an agreement with a rival in the polyurethane foam system market.  2006 WL 2225392, at *1.

Next, Plaintiff cites to *Gen. Indus. Corp. v. Hartz Mountain Corp*., 810 F.2d 795 (8th Cir. 1987), for the proposition that the court upheld a judgment for a distributor when the manufacturer withdrew favorable credit terms.  (Doc. 27 at 7.)  Notably, the facts in that case were that the defendant manufacturer approached the plaintiff to distribute its pet supply products even though the plaintiff already "distributed the products of other pet supply manufacturers." *Gen. Indus. Corp*., 810 F.2d at 798.  Therefore, the plaintiff in that case was not merely a distributor at the time the agreement was entered into but had other competing products that it was selling in the market.

Plaintiff  also  cites  to  *N.M.  Oncology  &  Hematology  Consultants,  Ltd.  v.  Presbyt. Healthcare Servs*., 54 F. Supp.3d 1189 (D.N.M. 2014) for the proposition that the buyer in that case sought to eliminate the plaintiff from the market.  The court found that the plaintiff had alleged a refusal to deal and determined that the parties were competitors for oncology services. *Id.* at 1203, 1215 ("Plaintiff was a perceived competitor of Defendant PHP, because PHP is affiliated with  Defendant  Presbyterian  Hospital,  and  Presbyterian  Hospital  is  a  direct  competitor  of

12

Plaintiff's in the market for comprehensive oncology services.")  The court is not persuaded by Plaintiff's citations to two cases that were decided before *Aspen Skiing* as the Supreme Court has stated that *Aspen Skiing* is the limited exception concerning refusal-to-deal allegations.  *Trinko*, 540 U.S. at 409.

One of the primary requirements of *Aspen Skiing* is a voluntary undertaking of a course of dealing between rivals.  *Id.*; *Novell, Inc*., 731 F.3d at 1074 ("[T]his court and the Supreme Court upheld a jury verdict finding liability when a monopolist (Aspen Skiing Company) *first voluntarily agreed* to a sales and marketing joint venture with a *rival* (Aspen Highlands) and then later discontinued the venture even when the evidence suggested the arrangement remained a profitable one.") (emphasis supplied).  There are no allegations that Plaintiff and Defendant were rivals at the time the distribution agreement was entered into.  Notably, Plaintiff recognizes this by stating that Defendant "*created* H&C as a competitor in their 2017 Distribution and Supply Agreement." (Doc. 27 at 8) (emphasis supplied).

The Tenth Circuit and the Supreme Court have repeatedly pronounced that a business is "free to choose whether or not to do business with others and free to assign what prices they hope to secure for their own products."  *Novell, Inc*., 731 F.3d at 1072 (citing *Pac. Bell Tel. Co*., 555 U.S. at 448); *see also Trinko*, 540 U.S. at 408 ("[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'") (citation omitted).  *Aspen Skiing* is a limited exception to this general rule.  *Trinko*, 540 U.S. at 409.  Plaintiff seeks to extend *Aspen Skiing* to situations in which manufacturers refuse to supply product or raise prices on product to distributors even when those distributors were not rivals prior to entering into a distributorship agreement.  There is no support in the law for such a proposition.

While the allegations in this case do support a claim for breach of the agreement as discussed herein, that does not give rise to an antitrust violation under the Sherman Act.  "The mere existence of a contractual duty to supply goods does not by itself give rise to an antitrust 'duty to deal.'"  I*n re Adderall XR Antitrust Litig*., 754 F.3d 128, 135 (2d Cir. 2014), *as corrected* (June 19, 2014) (citation omitted).  Under Plaintiff's interpretation of *Aspen Skiing*, manufacturers could be subject to potential liability under the Sherman Act if they breach a distributor agreement, raise prices, or decide to sell their own products, presumably, under Plaintiff's logic, because the manufacturer has "created" a rival in entering into the agreement.  The antitrust laws "do not create a federal law of unfair competition or 'purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.'"  *Id.* (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp*., 509 U.S. 209, 225 (1993)).  The antitrust laws permit a business to sell its own products or to contract with a distributor to bring those products to the market.  An initial decision to adopt one business model does not lock Defendant into that model and preclude it from later deciding to sell its own products.  *Christy Sports, LLC v. Deer Valley Resort Co., Ltd*., 555 F.3d 1188, 1198 (10th Cir. 2009) ("The antitrust laws should not be allowed to stifle a business's ability to experiment in how it operates, nor forbid it to change course upon discovering a preferable path.").

The court finds that the allegations in Plaintiff's complaint do not plausibly allege that Defendant's actions constitute a refusal to deal under *Aspen Skiing*.  Defendant, as a manufacturer and seller of its products, is free to choose "whether or not to do business with others and free to assign what prices they hope to secure for their own products."  *Novell, Inc*., 731 F.3d at 1072 (citation omitted); *Trinko*, 540 U.S. at 408 (discussing that the Sherman Act does not prohibit a manufacturer from freely exercising its "own independent discretion as to parties with whom he will deal.")

14

Plaintiff's complaint also alleges that Defendant's discriminatory pricing is evidence of anticompetitive conduct.  (Complaint at ¶ 123.)  Defendant argues that the Sherman Act permits a manufacturer to set the prices for its products.  (Doc. 21 at 7-8.)  Plaintiff's response to Defendant's motion to dismiss, however, does not argue that Defendant's pricing structure by itself is anticompetitive conduct.  Rather, Plaintiff focuses on the alleged refusal to deal.  Because the Supreme Court and the Tenth Circuit have recognized a manufacturer's freedom to assign prices to its products and Plaintiff has failed to identify any authority for the proposition that the increase in pricing, along with the rebate program for sales in certain channels, is anticompetitive conduct, this conduct does not amount to anticompetitive conduct under the Sherman Act.  *See Novell, Inc.*, 731 F.3d at 1072.

Defendant's motion to dismiss Plaintiff's claims under the Sherman Act is granted.

### B. Robinson Patman Act Claim

Defendant moves for dismissal of Plaintiff's claim under the Robinson Patman Act, 15 U.S.C. § 13(a) (the "RPA").  In its complaint, Plaintiff alleges that Defendant violated the RPA by engaging in two separate sets of discriminatory pricing.  First, Defendant allegedly engaged in discriminatory pricing by charging a different price for products sold through the Ecommerce Channel and the Pet Store Channel, through the offering of rebates for products sold through the Pet Store Channel.  (Complaint at ¶ 192.)  Second, Defendant allegedly engaged in discriminatory pricing by selling its products directly or indirectly to its own Ecommerce Channel customers for a lower price than it charged Plaintiff for distribution to Plaintiff's Ecommerce Channel customers.  (Complaint at ¶ 195.)

The RPA provides as follows:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different

purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale ... and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

15 U.S.C. § 13(a).

To establish a violation, Plaintiff must show that: (1) "sales were made to two different purchasers in interstate commerce"; (2) "the product sold was of the same grade and quality"; (3) the "defendant discriminated in price as between the two purchasers"; and (4) "the discrimination had a prohibited effect on competition." *Spartan Concrete Prod., LLC v. Argos USVI, Corp.*, 929 F.3d 107, 113 (3d Cir. 2019) (quoting *Feesers, Inc. v. Michael Foods, Inc.*, 498 F.3d 206, 212 (3d Cir. 2007)); *see also Raynor Mfg. Co. v. Raynor Door Co.*, No. CIV.A. 07-2421-DJW, 2009 WL 211942, at *9 (D. Kan. Jan. 27, 2009).

Turning to the first allegation of price discrimination, Defendant argues that the price difference for products sold to Plaintiff for the two different channels cannot state a claim under the RPA because Plaintiff has failed to allege that there were two purchasers. Rather, the allegations clearly state that Plaintiff was the sole purchaser. In response, Plaintiff argues that Defendant cannot shield its price discrimination by directing it through Plaintiff and cites to authority that provides an action for indirect price discrimination. (Doc. 27 at 17-18.) While indirect price discrimination is actionable, that is not what Plaintiff has alleged in its complaint. Rather, Plaintiff alleges price discrimination due to direct sales to Plaintiff. Moreover, as stated in *Purolator Prods., Inc. v. Fed. Trade Comm'n*, 352 F.2d 874, 883 (7th Cir. 1965), the case cited by Plaintiff, the seller (Defendant here) must "control the terms upon which a buyer once removed may purchase the seller's product from the seller's immediate buyer" to state a claim of indirect

price discrimination under the RPA.  Even if Plaintiff has standing to raise such a claim on behalf of its purchasers, no such allegations are contained in the complaint.  *See Lewis v. Philip Morris Inc.*, 355 F.3d 515, 524 (6th Cir. 2004) ("The 'indirect purchaser' theory considers a plaintiff who has purchased through a middleman to be a 'purchaser' for Robinson–Patman purposes if the supplier 'sets or controls' the resale prices paid by the plaintiff.") (citation omitted).  Plaintiff's claim of price discrimination based on two different prices, due to the rebates in the Pet Store Channel, fails to state a claim under the RPA because there are not two different purchasers.  Rather, the only purchaser is Plaintiff.

Next, Plaintiff alleges that Defendant engaged in price discrimination by charging a different price to its own customers in the Ecommerce Channel than it charged to Plaintiff.  Defendant asserts that this fails to state a claim because the RPA requires that discriminatory pricing be charged to buyers in the same market and there is not an injury to competition if the purchasers are not at the same functional level, citing to *Best Brands Beverage, Inc. v. Falstaff Brewing Corp.*, 842 F.2d 578, 585 (2d Cir. 1987).  (Doc. 21 at 20.)  In response, Plaintiff asserts that its Ecommerce Channel customers compete on the same level as Amazon.com, Defendant's Ecommerce Channel customer, and that the price discrimination harms competition between its customers and Amazon.com.  (Doc. 27 at 16.)

In *Best Brands*, the court held that the plaintiff had not established an injury to competition because it did not compete with the favored purchaser.  842 F.2d at 585-86.  Although *Best Brands* did state that the purchasers must be at the same functional level, it did not involve a similar market scenario as here, where a manufacturer sells to both a distributor and a retailer.  Rather, the purchasers were at the same functional level but there was no evidence of actual competition between the two purchasers' territories.  *Id.* at 586.

17

The court finds that the statutory language and Supreme Court precedent support a finding that Plaintiff has sufficiently alleged injury to competition in this case as Plaintiff's customers compete with Defendant's customers.  In *Texaco Inc. v. Hasbrouck*, 496 U.S. 543 (1990), the Court recognized that "anti-competitive effects can occur based on price discrimination between distributors and retailers who both buy from a single manufacturer."  *Lycon Inc. v. Juenke*, 250 F.3d 285, 289 (5th Cir. 2001) (citing *Hasbrouck*, 496 at 557–59).  The Fifth Circuit discussed the *Hasbrouck* case as follows:

> In *Hasbrouck*, independent Texaco retailers, who bought gasoline directly from Texaco, sued Texaco claiming that the sale of gasoline at lower prices to wholesale distributors, who in turn sold to retailers who competed with the plaintiffs, constituted price discrimination in violation of the Robinson–Patman Act.  The Supreme Court held that the substantial lessening of competition between the favored wholesale distributors' customers (retailers in direct competition with the independent Texaco retailers) and the independent Texaco retailers constituted a violation of § 13(a) (§ 2(a) of the Robinson–Patman Act).  The Supreme Court focused on whether the price discrimination caused injury to competition regardless of whether the favored purchaser was a direct competitor at the same functional level as the disadvantaged purchaser.  Insofar as *Hasbrouck* addresses competitive consequences at different levels of distribution, it recognizes that anti-competitive effects can occur based on price discrimination between distributors and retailers who both buy from a single manufacturer.

*Lycon Inc.*, 250 F.3d at 289 (internal citations omitted).

The Supreme Court reasoned that the RPA "refers to discriminators, purchasers, and their customers."  *Hasbrouck*, 496 U.S. at 567.  A price discriminator cannot "avoid the sanctions of the Act by the simple expedient of adding an additional link to the distribution chain."  *Id.* at n. 26.  In this case, Plaintiff alleges that Defendant has sold its product to its Ecommerce Channel customers for less than it sells the same product to Plaintiff.  This has allegedly resulted in injuries to competition because it harms Plaintiff's customers who compete with Defendant's customers.  These allegations are sufficient to plausibly state a claim under the RPA.  *Id.* at 567.

.

18

Finally, Plaintiff's complaint makes a reference to section 13(c). That section "primarily targets dummy brokerages." *Hix Corp. v. Nat'l Screen Printing Equip. Inc.*, 108 F. Supp.2d 1204, 1206 (D. Kan. 2000). This section covers the use of a brokerage "to effect price discrimination." *Id.* Plaintiff's allegations do not support a claim under this section and Plaintiff's opposition to Defendant's motion does not address Defendant's arguments regarding the lack of a broker or intermediary.

Based on the foregoing, Defendant's motion to dismiss Plaintiff's claim under the RPA is granted in part and denied in part.

### C. Price Discrimination under Kansas law

Defendant moves for dismissal of Plaintiff's claim of price discrimination under K.S.A. 50-149 on the basis that the statue does not provide a private right of action, citing *Cease v. Safelite Glass Corp.*, 927 F. Supp. 1452, 1455 (D. Kan. 1996). In response, Plaintiff argues that K.S.A. 50-161, enacted in 2000, provides a private right of action under all statutes contained in the Restraint of Trade Act. In *Cease*, the court held that the legislature had not created a private right because the statute only allowed the attorney general to bring an action. *Cease*, 927 F. Supp. at 1455. The statutory scheme was later amended to provide as follows:

> (b) Except as provided in K.S.A. 12-205, and amendments thereto, any person who may be damaged or injured by any agreement, monopoly, trust, conspiracy or combination which is declared unlawful by the Kansas restraint of trade act shall have a cause of action against any person causing such damage or injury. Such action may be brought by any person who is injured in such person's business or property by reason of anything forbidden or declared unlawful by the Kansas restraint of trade act, regardless of whether such injured person dealt directly or indirectly with the defendant. The plaintiff in any action commenced hereunder in the district court of the county wherein such plaintiff resides, or the district court of the county of the defendant's principal place of business, may sue for and recover treble the actual damages sustained. In addition, any person who is threatened with injury or additional injury by reason of any person's violation of the Kansas restraint of trade act may commence an action in such district court to enjoin any such violation, and any damages suffered may be sued for and recovered in the same

action in addition to injunctive relief. Any suit for injunctive relief against a municipality shall be subject to the provisions of K.S.A. 12-205, and amendments thereto.

K.S.A. 50-161(b).

Defendant argues that this does not provide a private right of action for price discrimination as Plaintiff has not alleged that it was damaged by an agreement, monopoly, trust, or conspiracy. Although the statute is somewhat confusing, it does allow a person to bring an action by any person who is injured by reason of anything declared unlawful by the Kansas Restraint of Trade Act (the "KRTA"). Section 50-149 is included in the KRTA. K.S.A. 50-158. Moreover, although in dicta, the Kansas Supreme Court has recognized that 50-161 provides a private right of action under all of the KRTA. *O'Brien v. Leegin Creative Leather Prods., Inc.*, 294 Kan. 318, 351, 277 P.3d 1062, 1084 (2012).

Therefore, Defendant's motion to dismiss Plaintiff's claim on this basis is denied. Defendant raises additional arguments in its reply brief. The court does not consider arguments raised for the first time in a reply brief. *Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011) (quotations and citation omitted); *see also Clark v. City of Shawnee, Kansas*, No. 15-4965-SAC, 2017 WL 698499, at *1 (D. Kan. Feb. 22, 2017) (applying *Reedy* to district courts).

Defendant's motion to dismiss this claim is denied.

## D.  Breach of Contract Claim

Plaintiff has alleged that Defendant breached the agreement by failing to perform according to its terms, including failing to provide products in accordance with purchase orders and by selling products to customers in the Pet Store Channel. (Complaint at 44-45.)[2] To state a claim for breach of contract under Kansas law, Plaintiff must show: "(1) the existence of a contract between the

---

[2] Because the court has determined that Plaintiff has sufficiently stated a claim for breach of contract as discussed herein, the court does not need to address the sufficiency of all of Plaintiff's allegations of breach.

parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach." *Lawson v. Spirit AeroSystems, Inc*., No. 18-CV-01100-EFM-KGS, 2018 WL 3973150, at *5 (D. Kan. Aug. 20, 2018) (citing *Stechschulte v. Jennings*, 297 Kan. 2, 298 P.3d 1083, 1098 (2013)).  Defendant argues that Plaintiff has failed to plausibly allege a breach of the agreement and that Plaintiff's damages are precluded by the terms of the agreement.

Defendant argues that it has not breached the agreement because the forecasts and Binding Forecasts are Plaintiff's obligations under the agreement and Defendant has no obligation to provide its products unless it has accepted a purchase order.  Plaintiff, however, has alleged that Defendant failed to fulfill purchase orders that were accepted by Defendant.  (Complaint at ¶ 72.) Defendant argues that this is not sufficient because Plaintiff has not provided information such as purchase order numbers, dates, quantities.  (Doc. 33 at 10-11.)  The court finds that Plaintiff's allegations are sufficient to put Defendant on notice of the claim.  Plaintiff has alleged that Defendant significantly reduced Plaintiff's orders between September 2019 and March 2020 and that in March 2020, Defendant reduced Plaintiff's orders to twenty percent of what Plaintiff requested.  Along with Plaintiff's allegations that Defendant refused to fill orders it had accepted, these allegations are sufficient to allege a breach of the agreement.

Moreover, Plaintiff alleges that Defendant has breached the agreement by failing to provide the minimum annual quantity of product.  Defendant argues that this provision is not binding on it.  The court disagrees.  The agreement provides as follows:

3.4 <u>Minimum Annual Quantity</u>.

3.4.1   During the Initial Term of this Agreement, Distributor shall purchase from Ceva, a minimum annual quantity of the Product as indicated in Appendix A (the "Minimum Annual Quantity").

3.4.2   For any Renewal Term, as provided for in Section 9.1, the Minimum Annual Quantity of Products to be purchased by Distributor shall be mutually agreed upon by the Parties not later than three (3) months before the beginning of each such Renewal Tenn.

3.4.3   Should the Parties fail to arrive at an agreement with respect to such Minimum Annual Quantities to be purchased by Distributor during any Renewal Term, said quantities shall be not less than the Minimum Annual Quantity which should have been purchased for the then-current year plus ten percent (10%).

(*Id*. at ¶ 3.4.)   The initial term of the agreement goes through December 31, 2020.  (*Id*. at ¶ 9.1.) Appendix A to the agreement requires the minimum annual purchase of the majority of products to be four million dollars and also requires Plaintiff to purchase several hundred thousand doses of Catego® for Cats.  Plaintiff has alleged that the agreement requires the annual purchase of approximately five million dollars in product and that Defendant has failed to provide this product under the agreement.

Defendant argues that the minimum annual quantity provisions only require obligations on the part of Plaintiff.  Essentially, Defendant argues it has no duty to provide the products. Defendant does not cite any authority that would support its position.  The agreement clearly places an absolute obligation on Plaintiff to buy approximately five million dollars' worth of product.  It states that Plaintiff *shall purchase* the product from Defendant.  Although the agreement does not explicitly state that Defendant shall sell the product, the court finds that Plaintiff has plausibly alleged a breach of the agreement in that the minimum annual quantity provision provides Plaintiff with an absolute right to purchase the minimum quantity from Defendant under the agreement, except for reasons related to force majeure under paragraph 14.3.

Plaintiff also alleges that Defendant breached the agreement by selling its products to customers in the Pet Store Channel.  Defendant argues that these allegations do not breach the

agreement because Plaintiff only had the exclusive right to sell the items listed in the appendix of the agreement.  (Doc. 21 at 20-21.)  That list includes the product name, a number, and pricing, such as "ADAPTIL® Spray 20 mL."  (Agmt. at App. A.)  Defendant's argument is elevating form over substance.  Plaintiff has alleged that Defendant is selling its products in the Pet Store Channel and included examples.   Defendant is allegedly selling its products under the name of ThunderEase, the company that it just acquired.  According to Plaintiff, they are the same products but are in different packaging.  The packaging states that the product is "powered by ADAPTIL," but it is allegedly the same product that Plaintiff has the exclusive right to sell in different packaging.  (Complaint at ¶ 95.)  Under the allegations, the court finds that Plaintiff has stated a plausible claim of breach of contract.

At this stage of the proceedings, the court finds that Plaintiff has plausibly alleged that Defendant breached the agreement.

### E.  Damages

Defendant also argues that Plaintiff has failed to state a claim for breach of contract because Plaintiff only seeks damages that are precluded under the agreement.  For Plaintiff's claims of breach of contract and breach of fiduciary duty, Plaintiff seeks damages for "lost sales, lost margin, lost profits, lost investments, and reputational and operational harm."  (Complaint at §§ 228, 235.) The agreement contains the following limitation of liability provision:

> Limits of Liability. EXCEPT FOR A BREACH OF ARTICLE 10 OR FOR CLAIMS OF A THIRD PARTY WHICH ARE SUBJECT TO INDEMNIFICATION UNDER THIS ARTICLE 13, IN NO EVENT WILL EITHER PARTY BE LIABLE FOR LOST PROFITS, OR ANY OTHER SPECIAL, PUNITIVE, INDIRECT, CONSEQUENTIAL OR INCIDENTAL DAMAGES, HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. THIS LIMITATION SHALL APPLY EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF

SUCH DAMAGES, AND NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY.

(Agmt. at § 13.6).

Defendant argues that this section precludes any recovery of lost profits or reliance damages. Plaintiff argues that this provision only precludes lost profits as consequential damages and not lost profits that are direct damages. The court need not dissect the language of the agreement to determine whether both types of lost profits are excluded as Kansas law clearly provides that the lost profits Plaintiff seeks in this case are consequential damages.

Recently, this court explained that "Kansas courts hold that a buyer's lost resale profits after a supplier's breach are consequential damages, even when the buyer cannot fulfill a pre-existing resale contract as a direct result of the breach." *No Spill, Inc. v. Scepter Canada, Inc*., 429 F. Supp.3d 768, 783 (D. Kan. 2019) (citing *Tongish v. Thomas*, 251 Kan. 728, 840 P.2d 471, 474 (1992)). In that case, the supply agreement excluded consequential lost profits and the plaintiff argued that its profits were direct damages and not consequential. Reviewing authority from the Tenth Circuit and Kansas, Judge Robinson discussed how lost profits can be classified as either direct damages or consequential damages.

> Direct damages refer to those which the party lost from the contract itself—in other words, the benefit of the bargain—while consequential damages refer to economic harm beyond the immediate scope of the contract. Lost profits, under appropriate circumstances, can be recoverable as a component of either (and both) direct and consequential damages. Thus, for example, if a services contract is breached and the plaintiff anticipated a profit under the contract, those profits would be recoverable as a component of direct, benefit of the bargain damages. If that same breach had the knock-on effect of causing the plaintiff to close its doors, precluding it from performing other work for which it had contracted and from which it expected to make a profit, those lost profits might be recovered as "consequential" to the breach.

*Id.* at 782 (quoting *Penncro Assocs., Inc. v. Sprint Spectrum, L.P*., 499 F.3d 1151, 1156 (10th Cir. 2007) (applying Kansas law)).

Applying *Penncro* and Kansas law, Judge Robinson explained that damages that do not flow directly from the breach are consequential damages.  In a supply agreement, such as the agreement at issue here, the seller agrees to supply product which is then resold to a third-party buyer, through contract or otherwise.  While both parties to the original agreement know that the buyer is going to resell the goods, the profits that are lost when the seller breaches the supply agreement are not direct damages because they are not anticipated profits under the agreement.  Rather, those damages are calculated based on contracts that the buyer has with a third-party.

Plaintiff argues that *Penncro* actually supports its position because the court of appeals determined that the lost profits in *Penncro* were direct damages. But the contract at issue in *Penncro* was a services contract and the court of appeals determined that the lost profits flowed directly from the agreement that was breached.  The profits were evidenced from the agreement itself.  Sprint was required to pay for a fixed number of hours of labor.  *Penncro*, 499 F.3d at 1156-58.  The court of appeals later reiterated its explanation of the difference in *SOLIDFX, LLC v. Jeppesen Sanderson, Inc*., 841 F.3d 827, 839 (10th Cir. 2016) (applying Colorado law).  The Tenth Circuit explained that "lost profits often fall within the larger category of consequential damages, [but] lost profits that flow directly from the breach of the contract itself are properly characterized as direct damages."  *Id.*  The court of appeals went on to find that the plaintiff's lost profits were not direct damages because it "did not present evidence of profits expected from the License Agreement itself" but calculated its lost profits using future sales to third parties.  *Id.* at 840.  Those lost profits are consequential because they are not "necessarily inherent in the contract" but "contingent on future deals with a business that was not a party to the contract, and on anticipated prices and demand that were not determined by the contract itself."  *Id.* (internal citation and

quotations omitted)(citing *Atlantech Inc. v. American Panel Corp.*, 743 F.3d 287, 294 (1st Cir. 2014)).

Plaintiff's allegations in this case do not plausibly allege that Plaintiff's profits flow directly from the agreement.  Rather, it is a supply agreement that dictates the price of the product.  Although the agreement clearly anticipates that Plaintiff will resell those products in both the Pet Store and Ecommerce Channels, those lost profits are not evidenced from the agreement but from the lost sales with third-party buyers.  Under Kansas law, those lost profits are consequential damages.  *No Spill, Inc.*, 429 F. Supp.3d at 783.

Turning to reliance damages, Defendant argues that these damages are consequential damages as well and precluded by the agreement.  Plaintiff counters that its marketing expenses were required under the agreement; therefore, they are direct damages and it can recover those investments that were rendered valueless due to the breach.  (Doc. 27 at 29.)  Reliance damages are consistent with Kansas law.  *See Source Direct, Inc. v. Mantell,* 19 Kan. App.2d 399, 408–09, 870 P.2d 686, 693 (1994); *Leichty v. Bethel Coll.*, No. 19-1064-JWB, 2019 WL 5549167, at *6 (D. Kan. Oct. 28, 2019).  Defendant cites to *ARMOUR Capital Mgmt. LP v. SS&C Techs., Inc.*, 407 F. Supp. 3d 98 (D. Conn. 2019), in support of its position that reliance damages are consequential damages.  That case, however, was applying Connecticut law.  *Id.* at 109-10.

In this case, Plaintiff has alleged that it spent millions of dollars in marketing and was required to spend significant sums in marketing under the terms of the agreement.  (Complaint at ¶¶ 55, 164.)  The agreement supports Plaintiff's allegation that it was required to spend money on marketing Defendant's products.  (Agmt. at §§ 6.1, 6.4.)

Based on the allegations and the provisions in the agreement, the court finds that Plaintiff has plausibly alleged reliance damages that flowed directly from the breach in that the agreement

required Plaintiff to spend a certain sum per year to market Defendant's products. Those expenditures are evidenced from the agreement itself. Therefore, the reliance damages are not barred by the limits of liability contained in the agreement.

Plaintiff makes no attempt to argue that its damages for lost sales, lost margin, and reputational and operational harm are direct damages. These damages are not lost from the contract itself but are a result of harm beyond the immediate scope of the contract. Therefore, they are consequential damages and are not recoverable due to the limits of liability contained in the agreement. *See Penncro*, 499 F.3d at 1156.

Plaintiff also seeks specific performance in the event that damages may not make it whole. Defendant's only objection to specific performance is that Plaintiff failed to state a claim for breach. (Doc. 33 at 15.) Because Plaintiff has plausibly alleged a claim for breach of the agreement, Plaintiff may also seek specific performance.

### F. Specific Performance Claim

Defendant moves for dismissal of Plaintiff's claim of specific performance pursuant to K.S.A. 2-716. Defendant argues that Plaintiff has not plausibly alleged that Defendant has failed to perform an obligation under the contract and therefore specific performance is not an available remedy. (Doc. 21 at 17.) The court has determined that Plaintiff has plausibly stated a claim of breach of the agreement.

Defendant's motion to dismiss this claim is denied.

### G. Breach of Duty of Good Faith

Plaintiff has also asserted a claim of breach of good faith. "Kansas law implies a duty of good faith in every contract." *Cargill Meat Sols. Corp. v. Premium Beef Feeders, LLC*, 168 F. Supp.3d 1334, 1345 (D. Kan. 2016) (citation omitted). This duty grows out of the contract

obligations and "only amplifies duties and rights already existing under the terms of the agreement." *Id.* (citing *Pizza Mgmt., Inc. v. Pizza Hut, Inc.*, 737 F. Supp. 1154, 1184 (D. Kan. 1990)).  This duty includes "not intentionally and purposely … do[ing] anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Warkentine v. Salina Pub. Sch., Unified Sch. Dist. No. 305*, 921 F. Supp.2d 1127, 1134 (D. Kan. 2013) (quoting *Bonanza, Inc. v. McLean*, 242 Kan. 209, 747 P.2d 792, 801 (1987)).  Breach of the implied covenant of good faith and fair dealing is not a separate claim, but rather a "legal argument related to a breach-of-contract claim." *Classico, LLC v. United Fire & Cas. Co.*, 386 P.3d 529, 2016 WL 7324451, *5 (Kan. Ct. App. Dec. 16, 2016).  "[I]n order to prevail on an implied duty of good faith and fair dealing theory under Kansas law, plaintiffs must (1) plead a cause of action for 'breach of contract,' not a separate cause of action for 'breach of duty of good faith,' and (2) point to a term in the contract 'which the defendant[ ] allegedly violated by failing to abide by the good faith spirit of that term.'" *Id.* (quoting *Wayman v. Amoco Oil Co.*, 923 F. Supp. 1322, 1359 (D. Kan. 1996)).

Plaintiff alleges that Defendant breached this duty by modifying and rejecting purchase orders, imposing a capricious rebate scheme, imposing discriminatory pricing, preventing Plaintiff from maintaining products, using Plaintiff's confidential sales and inventory data, and selling products to other distributors in lieu of Plaintiff.  Defendant argues that this claim fails because Plaintiff has not sufficiently alleged a breach of the agreement.  As discussed herein, Plaintiff has plausibly alleged a breach of the agreement with respect to rejection of purchase orders, failure to provide product, and selling products in the Pet Store Channel.

Based on the foregoing, to the extent Plaintiff is trying to state a separate claim for breach of the duty of good faith and fair dealing, Defendant's motion is granted.  However, that does not

preclude Plaintiff from presenting evidence that Defendant's failure to fulfill its duty of good faith and fair dealing resulted in a breach of an express term of their contract.

**IV.      Conclusion**

Defendant's motion (Doc. 20) is GRANTED IN PART and DENIED IN PART.  Plaintiff's claims under the Sherman Act are dismissed.  Plaintiff's claim under the Robinson-Patman Act is dismissed to the extent it is alleging price discrimination based on rebates offered for Plaintiff's sales to the Pet Store Channel customers.  Plaintiff's claim of breach of good faith is dismissed to the extent Plaintiff attempts to state a separate claim.   As to the remaining claim under the Robinson-Patman Act alleging price discrimination in sales to Plaintiff and Defendant's Ecommerce customers, Defendant's motion is denied.  Defendant's motion to dismiss Plaintiff's remaining claims is denied.

IT IS SO ORDERED.  Dated this 30th day of October, 2020.

s/ John W. Broomes
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE